IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MINORITY TELEVISION PROJECT INC., | No. C-06-02699 EDL |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA | |
| Defendants. | |

Plaintiff Minority Television Project, a non-profit California corporation, is the licensee of non-commercial educational television station KMTP-TV, San Francisco, pursuant to a license granted by Defendant Federal Communications Commission ("FCC"). First Amended Complaint ("FAC") ¶ 5. As the operator of KMTP-TV, Plaintiff is subject to the restrictions on broadcasting announcements acknowledging donors and the prohibition against certain paid promotional announcements set forth in 47 U.S.C. § 399b and 47 C.F.R. § 73.621(e). FAC ¶ 17. Plaintiff challenges the constitutionality of these restrictions. In particular, Plaintiff claims that the ban on paid advertisements relaying views on matters of public importance or supporting or opposing political candidates facially discriminates against non-commercial speech. Plaintiff also claims that regulations restricting paid advertisements to promote services, facilities, or products are unconstitutionally vague.

Plaintiff filed its original Complaint on September 19, 2006, alleging numerous constitutional causes of action. Defendants moved to dismiss those claims. The Court held a hearing on February 13, 2007 and on March 13, 2007, the Court dismissed all of the claims with prejudice, except for the following claims, which it dismissed with leave to amend: (1) facial constitutional challenge to 47 U.S.C. § 399b contained in the first claim for violation of the First

Amendment for imposition of greater restrictions on certain non-commercial speech than on certain commercial speech; (2) facial constitutional challenge to 47 U.S.C. § 399b contained in the third claim for violation of the First Amendment for imposition of greater restrictions on certain non-commercial speech than on other non-commercial speech; and (3) facial constitutional challenge to 47 U.S.C. § 399b contained in the fifth claim for violation of the First and Fifth Amendments for unconstitutionally vague restrictions on protected speech.

Plaintiff filed an amended complaint on February 28, 2007, re-alleging the claims dismissed with prejudice as well as the facial constitutional challenges. Plaintiff has no objection to the dismissal of the claims already dismissed with prejudice.[1] Accordingly, Defendants' motion is GRANTED with respect to the previously dismissed second, fourth, sixth, seventh, eight, and ninth claims, as well as the as-applied challenges in the first, third, and fifth claims. As to the remaining claims, Defendants maintain that the first and third claims for relief, which only challenge sections 399b(a)(2) and 399b(a)(3), should be dismissed because Plaintiff lacks standing to challenge them and because those provisions pass intermediate scrutiny. Defendants also argue that the fifth claim should be dismissed because § 399b is not unconstitutionally vague. For the reasons discussed below, the remainder of Defendants' Motion is DENIED.

## I.    FACTUAL ALLEGATIONS

Briefly, Plaintiffs' allegations are as follows. In the course of its operations, Plaintiff has broadcast a number of announcements identifying its donors. As a consequence of complaints from another broadcaster, the FCC commenced a proceeding against Plaintiff for repeatedly going beyond the limited identification of donors permitted under 47 U.S.C. § 399b. Its Notice of Apparent Liability For Forfeiture against Plaintiff ("NAL") stated: "we find that Minority Television Project, Inc. ("Minority"), licensee of non-commercial educational television station KMTP-TV, San Francisco, California, apparently violated Section 399b of the Communications Act of 1934, as amended ("the Act"), 47 U.S.C. § 399b, and Section 73.621 of the Commission's Rules, 47 C.F.R. § 73.621, by willfully and repeatedly broadcasting advertisements. Based on our review of the facts

---

[1] Plaintiff included these causes of action in the amended complaint out of an abundance of caution, because it had not yet received the Court's March 13, 2007 Order when it filed its amended complaint.

2

and circumstances of this case, we conclude that Minority is apparently liable for a monetary forfeiture in the amount of Ten Thousand Dollars ($10,000)." FAC ¶ 18 and Ex. A.

The FCC followed with a Forfeiture Order for $10,000.00 for "willful and repeated broadcast of advertisements over the station, in violation of Section 399b of the Communications Act of 1934, as amended ("the Act"), and section 73.621(e) of the Commission's rules." FAC, Ex. B (Forfeiture Order, 18 FCC Rcd 26661 (2003)). In doing so, the Forfeiture Order acknowledged that "the Commission has recognized that 'it may be difficult to distinguish at times between announcements that promote and those that identify.' Thus it defers to 'reasonable, good faith judgments' by licensees and finds violations only where material is 'clearly' promotional as opposed to identifying." FAC ¶ 19. Id. at ¶ 7. "We believe that this test is sufficiently clear and objective particularly as applied to this case." Id. (citing Xavier University, 5 FCC Rcd 4920 (1990)).

The FCC denied Plaintiff's Petition for Review, specifically rejecting Plaintiff's First Amendment arguments and request that the Commission revisit its underwriting announcement rules to make them clearer. FAC ¶ 20 and Ex. C (Order on Review, 19 FCC Rcd 25116 (2004)). The FCC also denied Plaintiff's Petition for Reconsideration. FAC ¶ 21 and Ex. D.

On December 23, 2005, Plaintiff filed a Petition for Review of the FCC orders in the U.S. Court of Appeals for the Ninth Circuit. FAC ¶ 22. Shortly thereafter, on February 16, 2006, Petitioner paid the $10,000 forfeiture to the FCC. FAC ¶ 22. On April 18, 2006, the Ninth Circuit sua sponte transferred the case to this Court. Id.

With respect to standing, Plaintiff notes that the FCC has been vigorously enforcing 47 U.S.C. § 399b and 47 C.F.R. § 73.621(d), and that on February 15, 2007, the FCC "issued an order adopting a Consent Decree, which terminated an investigation of the Bureau into whether CSSI Non-Profit Educational Broadcasting Corporation ("CSSI") had violated 47 U.S.C. § 399b and FCC regulations in connection with the broadcast by CSSI of underwriting announcements over CSSI's stations." FAC ¶ 23. In addition, Plaintiff alleges that:

> Plaintiff wishes to broadcast announcements from donors that on their face would violate 47 U.S.C. § 399b, namely announcements which are intended to express the views of any person with respect to any matter of public importance or interest, or to support or oppose any candidate for political office. Although Plaintiff believes that the provisions of 47 U.S.C. § 399b which prohibit Plaintiff from broadcasting announcements which are intended to express the views of any person with respect to

3

any matter of public importance or interest, or to support or oppose any candidate for political office are unconstitutional, Plaintiff fears that its broadcast of said announcements will result in enforcement actions against Plaintiff by Defendant FCC which would subject Plaintiff to substantial monetary forfeitures and which could jeopardize its broadcast license. Plaintiff has declined to broadcast announcements which are intended to express the views of any person with respect to any matter of public importance or interest, or to support or oppose any candidate for political office because of its fear that, if it were to broadcast said announcements, the broadcast of said announcements will result in enforcement actions by Defendant FCC against Plaintiff which could subject Plaintiff to substantial monetary forfeitures and which could jeopardize its broadcast license.

FAC ¶ 24.

Plaintiff also wishes to broadcast announcements where it is unclear whether said announcements violate the prohibitions of 47 U.S.C. § 399b and/or 47 C.F.R. § 73.621(e). Although Plaintiff believes that 47 U.S.C. § 399b and 47 C.F.R. § 73.621(e), on their face and as applied, unconstitutionally fail to give persons of ordinary intelligence adequate notice of what conduct is proscribed, Plaintiff fears that its broadcast of announcements where it is unclear whether said announcements are prohibited by 47 U.S.C. § 399B and/or 47 C.F.R. § 73.621(e) will result in enforcement actions against Plaintiff by Defendant FCC which would subject Plaintiff to substantial monetary forfeitures and which could jeopardize its broadcast license. Plaintiff has declined to broadcast certain [sic] because it is unclear whether said announcements are [sic] and prohibited by 47 U.S.C. § 399b and/or 47 C.F.R. § 73.621(e) and because of its fear that, if it were to broadcast said announcements, the broadcast of said announcements will result in enforcement actions against Plaintiff which could subject Plaintiff to substantial monetary forfeitures and which could jeopardize its broadcast license.

FAC ¶ 25.

## II. ANALYSIS

### A. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Review is limited to the contents of the complaint. Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995). Federal Rule of Civil Procedure 8(a)(2) requires only that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Specific facts are unnecessary; the statement need only give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007) (quoting Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964 (2007)). All allegations of material fact are taken as true. Erickson, 127 S.Ct. at 2200. However, a plaintiff's obligation to

4

provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic, 127 S.Ct. at 1964-65 (citations and quotations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965. A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. See id. at 1966-67.

**B. Relevant Statute**

The challenged statute states in relevant part:

(a) "Advertisement" defined.

For purposes of this section, the term "advertisement" means any message or other programming material which is broadcast or otherwise transmitted in exchange for any remuneration, and which is intended–

(1) to promote any service, facility, or product offered by any person who is engaged in such offering for profit;
(2) to express the views of any person with respect to any matter of public importance or interest; or
(3) to support or oppose any candidate for political office.

(b) Offering of services, facilities, or products permitted; advertisements prohibited.

(1) Except as provided in paragraph (2), each public broadcast station shall be authorized to engage in the offering of services, facilities, or products in exchange for remuneration.
(2) No public broadcast station may make its facilities available to any person for the broadcasting of any advertisement.

47 U.S.C. section 399b.

Section 399b thus regulates both "commercial" speech (§ 399b(a)(1)) and "non-commercial" speech (§ 399b(a)(2) and (3)). Motion to Dismiss ("Mot.") at 8; FAC ¶¶ 29, 34-35.

**C. Defendants' Motion**

1. Standing

Defendants challenge Plaintiff's standing to raise a facial challenge to subsections (2) and (3) of § 399b(a). Plaintiff alleges that the FCC has been vigorously enforcing § 399b. FAC ¶ 6, 26. Plaintiff also points to one specific FCC investigation of whether CSSI Non-Profit Educational Broadcasting had violated 47 U.S.C. § 399b and FCC regulations with its broadcast of underwriting

5

announcements, although this allegation does not specifically relate to subsections (2) and (3). FAC ¶ 23. While Plaintiff does not give specific examples of advertisements it wishes to broadcast that would violate § 299b(2) and (3), it alleges that it wishes to broadcast paid announcements intended to express the views of any person with respect to a matter of public importance or to support or oppose any candidate for political office, but has declined to do so because of fear of enforcement by the FCC. FAC ¶ 24.

To demonstrate standing, a plaintiff "must allege (1) a 'distinct and palpable' injury-in-fact that is (2) 'fairly traceable' to the challenged provision or interpretation and (3) would 'likely . . . be redressed' by a favorable decision." Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1033 (9th Cir. 2006) (internal citation omitted). Additionally, special standing principles apply in First Amendment cases. Facial constitutional challenges come in two varieties. First, a plaintiff seeking to vindicate his own constitutional rights may argue that an ordinance "is unconstitutionally vague or . . . impermissibly restricts a protected activity." Second, "an individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court." Id. (citations omitted).

In Santa Monica Foods Not Bombs, the plaintiff wanted to hold a march that started in Santa Monica, but had pursued other locations only because of the burden of Santa Monica's permit requirements. The fact that plaintiff never applied for a permit did not destroy its standing. Id. at 1034. Its averment that it modified its behavior because of the permit requirements was sufficient. Plaintiff's "apprehension that the Events Ordinance would be enforced against it for engaging in activities protected by the First Amendment without a permit is sufficient to establish an injury-in-fact and support a facial challenge." Id. Similarly, here, Plaintiff has alleged an apprehension that the statute would be enforced against it for engaging in activities protected by the First Amendment and that it has modified its behavior as a result. Under the liberal notice pleading standards, therefore, Plaintiff has alleged the necessary elements to show standing.

Turning to the cases relied upon by Defendants, in Doucette v. City of Santa Monica, 955 F. Supp. 1192 (C.D. Cal. 1997), the parties moved for summary adjudication, not for dismissal. That

6

court stated that a plaintiff must proffer some objective evidence to substantiate a First Amendment claim that the challenged law has deterred him from engaging in a protected activity. Id. at 1200. The question is how likely it is that the government will attempt to use the challenged provisions against the plaintiff, not merely how much the prospect of enforcement worries the plaintiff. Id. Because of the procedural posture, the court examined the evidence to determine whether others engaging in the activity had been prosecuted. Doucette, however, does not stand for the proposition that a plaintiff must make these specific allegations in the complaint. Similarly, Action for Childrens Television v. FCC, 827 F. Supp. 4 (D.D.C. 1993), relied upon by Defendants, also ruled on a motion for summary judgment. Here, Plaintiff has alleged some objective evidence of deterrence through its allegations of the FCC's vigorous enforcement of the statute, which is sufficient at this stage.

Finally, while Fox v. Reed, Case No. 99-3094, 2000 U.S. Dist. LEXIS 3318 (E.D. La. 2000) ruled for defendant against the plaintiffs on a motion to dismiss, the plaintiffs there did not allege that they intended to engage in any conduct proscribed by the criminal statute that they challenged, nor that they ever did so. In contrast, Plaintiff here alleges that it wishes to engage in conduct proscribed by the statute at issue. FAC ¶ 24. It is possible that facts obtained in discovery may show that Plaintiff has no real intention or desire to broadcast announcements that would violate subsections (2) and (3) of § 399b, or that Defendants do not enforce these subsections. However, it would be premature to dismiss on this basis at this stage in the litigation.

        2.        Facial Challenge (First and Third Claims)

Plaintiff's first and third causes of action challenge the constitutionality of subsections (2) and (3) of § 399b(a), which prohibit broadcasters from broadcasting in exchange for remuneration any program material intended to support or oppose any candidate for political office or to express the views of any person on a matter of public importance. The challenged statutes, while viewpoint neutral, are not content neutral. The statute does, however, allow unpaid speech relating to political campaigns and issues of public importance.

In its first claim, Plaintiff alleges that on its face § 399b "imposes greater restrictions on certain non-commercial speech than on certain commercial speech," and thus "constitutes a content-

7

based restriction on protected non-commercial speech in violation of the First Amendment." FAC ¶ 29. The third claim alleges that § 399b imposes greater restrictions on certain non-commercial speech than on other non-commercial speech" and violates the First Amendment. FAC ¶ 35. Defendants move to dismiss these claims on the grounds that the statute passes intermediate scrutiny.

The parties agree that the first and third claims regarding § 399b would survive a facial challenge if they are narrowly-tailored to further a substantial government interest. FCC v. League of Women Voters of California, 468 U.S. 364, 380 (1984). Under this test, "the government may employ the means of its choosing so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest." Turner Broadcasting Sys. v. FCC, 520 U.S. 180, 214-15 (1997) (internal quotation omitted).[2] While the Court need not defer to the judgment of Congress or the FCC, it should pay "careful attention to how the other branches of government have addressed" the complex issues involved in broadcasting. Columbia Broadcasting Sys. v. Democratic Nat'l Committee, 412 U.S. 94, 103 (1973).

In FCC v. League of Women Voters, the Supreme Court addressed the constitutionality of the Public Broadcasting Amendments Act of 1981's provision that, at the time, forbade any

---

[2] Defendants also argue that because Plaintiff is making a facial challenge, an additional standard applies under United States v. Salerno, 481 U.S. 739, 745 (1987), under which Plaintiff must establish that no set of circumstances exists under which the statute would be valid. Salerno, however, did not involve a First Amendment challenge, and that standard is not applicable in the First Amendment context. See id.; see also Hotel & Motel Ass'n of Oakland v. City of Oakland, 344 F.3d 959, 972 (9th Cir. 2003) ("Until a majority of the Supreme Court directs otherwise, a party challenging the facial validity of an ordinance on vagueness grounds outside the domain of the First Amendment must demonstrate that 'the enactment is impermissibly vague in all of its applications.'"); Hyung Joon Kim v. Ziglar, 276 F.3d 523, 527 (9th Cir. 2002) ("We recently reaffirmed the vitality of the Salerno standard outside of First Amendment cases.") (citing S.D. Myers, Inc. v. City and County of San Francisco, 253 F.3d 461, 467 (9th Cir. 2001)); Bull v. City & County of San Francisco, 2006 U.S. Dist. LEXIS 9120, n.6 (N.D. Cal. 2006) (J. Breyer) ("Subsequently, however, the Ninth Circuit has reaffirmed that the general standard for a facial constitutional challenge to a legislative act not involving the First Amendment or abortion remains the one set forth in United States v. Salerno") (citing S. D. Myers); Lerman v. Board of Elections, 232 F.3d 135, 144 (2d Cir. 2000) (noting that Salerno did not apply to case "in which the plaintiffs assert the violation of rights protected by the First Amendment") (citation omitted). While the Ninth Circuit relied on the Salerno standard (as articulated in Rust v. Sullivan) in Chamber of Commerce of the United States v. Lockyer, 463 F.3d 1076, 1080 (9th Cir. 2006), the central question in that case was whether a state's exercise of its sovereign power to control the use of its funds conflicts with national labor policy.

"noncommercial educational broadcasting station which receives a grant from the Corporation [for Public Broadcasting ("CPB")]" to "engage in editorializing." 47 U.S.C. § 399. The Supreme Court struck down the restriction on First Amendment grounds, as it could not find a way in which the ban advanced the government's interest. The Court also found that the ban was not narrowly tailored. See 468 U.S. at 384-85.

In holding that intermediate scrutiny applied to the First Amendment challenge to the broadcasting regulation, the Court noted that "[broadcast] frequencies are a scarce resource [that] must be portioned out among applicants." Id. at 377 (citing Columbia Broadcasting, 412 U.S. at 101). While the "Government's interest in ensuring balanced coverage of public issues is plainly both important and substantial, we have, at the same time, made clear that broadcasters are engaged in a vital and independent form of communicative activity." Id. at 378. "Indeed, if the public's interest in receiving a balanced presentation of views is to be fully served, we must necessarily rely in large part upon the editorial initiative and judgment of the broadcasters who bear the public trust." Id. While the broadcasting industry operates under unique restraints, "the thrust of these restrictions has generally been to secure the public's First Amendment interest in receiving a balanced presentation of views on diverse matters of public concern." Id. at 380. Making the judgment as to whether restrictions are narrowly tailored to further a substantial governmental interest, therefore, requires a critical examination of the interests of the public and broadcasters in light of the particular circumstances of each case. Id. at 380-81.

In considering whether the restraint imposed by former § 399 satisfied this test, the court considered two central features of the ban against editorializing. First, the Court noted that the restriction imposed by § 399 was specifically directed at a form of speech (the expression of editorial opinion) that lies at the heart of First Amendment protection. The statute foreclosed editorial opinion on controversial issues of public importance, and expression on public issues is accorded the highest protection. Id. at 382. Second, the scope of the ban was content-based and enforcement authorities had to examine the content of the messages to determine whether the views expressed concerned controversial issues of public importance. Id. at 383. While the statute was not a viewpoint-based restriction, the First Amendment's hostility to content-based regulation also

9

extends to prohibition of public discussion on an entire topic. Id. at 384.

In seeking to defend the prohibition, the government noted two substantial governmental interests: (1) to protect educational broadcasting stations from being coerced as a result of federal financing into becoming vehicles for government propaganda; and (2) to keep stations from becoming convenient targets for capture by private interest groups. Id. at 384-85. The Court examined legislative history and found that while the Act as a whole was concerned with providing programming that was free of government interference and political pressures, former § 399 was added out "of an abundance of caution." Id. at 387 & n.18 (citing H.R. Rep. No. 572, 90th Cong., 1st Sess., 20 (1967)). More importantly, the Court noted that this interest was not substantially advanced by § 399, as other parts of the Act already operated to insulate local stations from governmental interference. Id. at 388-89. Furthermore, suppressing the speech restricted by § 399 would not reduce substantially the risk of federal government interference, because limiting editorializing by local stations would likely primarily affect speech targeting local audiences rather than having a national impact. Id. at 390-91. Finally, the interest could be satisfied by less restrictive means, such as publishing a disclaimer that the station's editorials do not reflect the official view of the federal government. Id. at 395.

After deciding League of Women Voters, the Supreme Court analyzed "must carry" cable provisions that required cable operators to carry certain signals of local stations in Turner v. Broad. Sys. v. FCC, 512 U.S. 622 (1994) ("Turner I"). While Turner I involved cable media rather than scarce broadcast media, a plurality of the Court held that the appropriate standard to apply was the intermediate level of scrutiny that the parties agree applies here. Id. at 661. The Court reversed the grant of summary judgment, reasoning: "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' (citation omitted). It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Id. at 664 (citations omitted). The government must also show that its remedy does not "burden substantially more speech than is necessary to further the government's legitimate interests." Id. at 665 (citation omitted). The Court concluded that "[o]n the state of the

record developed thus far, and in the absence of findings of fact from the District Court, we are unable to conclude that the Government has satisfied either inquiry." Id. There was a "paucity of evidence indicating that broadcast television is in jeopardy" in the record. Id. at 667. "Also lacking are any findings concerning the actual effects of must-carry on the speech of cable operators and cable programmers--i.e., the extent to which cable operators will, in fact, be forced to make changes in their current or anticipated programming selections. . . ." Such evidence, however, was necessary for analyzing the narrowing step of the inquiry. Id. at 668. The record also lacked any judicial findings regarding less restrictive means of achieving the government's asserted interests. Id.

Subsequently, in Turner Broadcasting Sys. v. FCC, 520 U.S. 180 (1997) ("Turner II"), after eighteen months of factual development on remand yielding tens of thousands of pages of evidence, the Court upheld the district court order granting defendants' summary judgment motion and found that the must-carry provisions survived intermediate scrutiny. Id. at 187. The evidence on remand established the importance of cable to broadcast stations and suggested that expansion of the cable industry harmed broadcasting. Id. at 209-210. While the record contained evidence supporting a contrary conclusion, the legislative conclusion was reasonable and supported by substantial evidence. Id. The Court noted that the "expanded record now permits us to consider whether the must-carry provisions were designed to address a real harm, and whether those provisions will alleviate it in a material way." Id. at 194.

Here, Defendants contend that the substantial interest at stake is "ensuring that noncommercial educational stations remain free from paid influences of any kind" or, stated another way, keeping "the creation and maintenance of the nation's system of noncommercial educational television free from the financial influence of special interests." Mot. at 10:4-5; 11:17-19. At the hearing, the government characterized its interests as high quality educational television and being free from undue influence from commercial interests.

In establishing the Corporation for Public Broadcasting, Congress noted that "it is in the public interest to encourage the growth and development of public radio and television broadcasting, including the use of such media for instructional, educational, and cultural purposes." 47 U.S.C. § 396(a)(1). One purpose of the Public Broadcasting Act of 1967 is to "act so as to assure the

11

maximum freedom of noncommercial educational broadcasting systems and stations from interference with or control of program content or other activities." H.R. Rep. No. 97-82, p. 12 (97th Cong. 1st Sess. 1981). See also In Re Public Broadcasting Service, 86 F.C.C.2d 141 (1981) ("The aim of the noncommercial policy has been to remove the programming decisions of public broadcasters from the commercial market pressures under which broadcasters in the unreserved spectrum operate."). At the same time, in "order to encourage and promote the generation of new support to public broadcasting, the Committee fully recognized the need to facilitate income-producing activities on the part of public broadcast licensees." H.R. Rep. No. 97-82 at 15.

The Committee on Energy and Commerce set up a Commission to explore means of alternative financing for broadcasters, instructing the Commission to keep in mind the following criteria: "(a) continued growth in audience coverage and programming excellence, and (b) insulation of program control and content from the influence of special interests – be they commercial, political, or religious." Ultimately, Congress authorized public stations to broadcast paid-for logograms of program underwriters and advertisements of non-profits. 47 U.S.C. §§ 399a(a) & 399b(a). Prior to the FCC decision adopted in 1981, public stations were limited to identifying contributors by name only and the number of announcements was limited. The new policy allows the broadcast of the name of the contributor, its location, logogram or slogan, and a list of products or services offered. H.R. Rep. No. 97-82 at 23.

Thus, by allowing limited donor identification while still prohibiting other advertising, Congress appears to have intended to strike a balance that affords broadcasters financing beyond federal appropriations, while maintaining insulation from special influences, whether commercial or political. H.R. Rep. No. 97-82, p. 16. It also appears that ensuring high quality educational and cultural programming is an interest that is furthered by keeping the programming free of excessive paid advertising. Viewed from one angle, the ban facilitates broadcasters' control of their own programming time, rather than allowing others to spread their own special interest messages during paid-for advertising time, although it does allow broadcasters to run paid advertisements for non-profits and logogram and identifying announcements for commercial donors. However, viewed from another angle, the regulation takes away some of broadcasters' control over what paid content

12

to air. On balance, under intermediate scrutiny, it seems that the prohibitions in § 399b further the substantial interest of insulating broadcasters from special interests and ensuring high quality programming. Yet the parties only very superficially grapple with the legislative history of § 399b, and do not discuss whether other provisions of the Act would also serve that governmental interest sufficiently without the ban.

The more difficult question is whether the regulation is narrowly tailored to further that substantial interest. As for whether less restrictive means of regulation are available, in <u>League of Women Voters</u>, the Court analyzed less restrictive means than the total ban on editorializing at issue there, and noted that protecting broadcasters from government interference could be satisfied by less restrictive means, such as a disclaimer stating that the station's editorials do not reflect the views of the federal government. <u>Id</u>. at 388. Here, there has been very little analysis of less restrictive means by the parties.[3] It is true that only paid advertisements are barred here, so this prohibition is a great deal narrower than the outright ban on any editorializing at issue in <u>League of Women Voters</u>. If the statute instead outright prohibited broadcasters from airing both paid and unpaid messages from outside entities regarding candidates or important public issues, it would more seriously impinge upon broadcasters' editorial discretion. However, while Defendants' argument that the regulation is narrowly tailored because it only prohibits paid advertising may ultimately prevail, to dismiss the suit at this very early stage of the litigation would be premature. The emphasis by the Supreme Court in <u>Turner I</u> on developing a factual record before the District Court strongly cautions against granting the government's motion to dismiss without any factual record. "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it . . . must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." <u>Turner I</u> at 664. There are also no facts at this stage to allow this Court to determine whether "Congress has drawn reasonable inferences

---

[3] The law review article relied upon by Plaintiff, Andrew Cotlar, *You Said What, The Perils of Content-Based Regulation of Underwriting Acknowledgements*, 59 Fed. Comm. L.J. 47 (Dec. 2006), suggests that Congress revise the prohibition on promotional messages to eliminate the content-based restrictions so long as the announcements do not interrupt programming and are limited in length. Limiting the length of campaigning announcements and announcements on views of important issues, however, would probably not insulate broadcasters from monetary incentives to abdicate editorial control over political and public issues to those with the money to pay.

13

based on substantial evidence." Id. at 666. The Supreme Court's recognition of the importance of the "expanded record" in Turner II lends further support to this conclusion. 520 U.S. at 194. Accordingly, while summary judgment may be appropriate later, the Court will allow the parties to develop a fuller factual record.

As for Plaintiffs' argument that the regulation impermissibly favors commercial speech, Plaintiffs maintain that allowing certain speech like identification of the donor and its services, while prohibiting other protected categories of advertisement like expressing views on matters of public importance, unnecessarily imposed content-based restrictions upon the most protected categories of speech. While § 399b allows limited commercial speech, and is therefore less restrictive in certain respects than the older version of the statute, it requires a content-based evaluation of advertisements. In addition, it favors commercial speech over non-commercial speech to the extent that it allows commercial advertising in the form of logograms and identification of services, while prohibiting paid advertising about views on matters of public importance and political candidates that lie at the core of the First Amendment. Thus, if the evidence ultimately shows that the statute "imposes greater restrictions on noncommercial than on commercial" advertising, it may be invalid. Cf. Desert Outdoor Advertising v. City of Moreno Valley, 103 F.3d 814, 819 (9th Cir. 1996) (citing National Advertising Co. v. City of Orange, 861 F.2d 246, 248 (9th Cir. 1988) (citing Metromedia, 453 U.S. at 513, 516)) (noting that ordinance is invalid if it imposes greater restriction on noncommercial billboards or regulates those billboards based on their content). The limited broadcasting spectrum, however, presents a significantly different context than do billboards.

Finally, Defendants rely on Capital Broadcasting Co. v. Mitchell, 333 F. Supp. 582, 584 (D.D.C. 1971), aff'd, 405 U.S. 1000 (1972), for the proposition that plaintiffs have not lost the right to speech, but have only lost the right to accept payment for certain advertisements. That court noted that "[e]ven assuming that loss of revenue from cigarette advertisements affects petitioners with sufficient First Amendment interest, petitioners, themselves, have lost no right to speak -- they have only lost an ability to collect revenue from others for broadcasting their commercial messages." However, even if Capital Broadcasting is still good authority despite the Supreme Court's

14

1 subsequent extension of First Amendment protection to commercial speech, it is distinguishable
2 because it involved only strictly commercial speech, whereas the speech at issue here is political.
3 Advertisements supporting or opposing a political candidate or expressing views as to matters of
4 public importance receive heightened protection under the First Amendment. And even if Plaintiff's
5 own speech is not directly at issue, prohibitions on broadcasters' ability to run paid advertisements
6 regarding campaigns or matters of public importance does lessen their editorial discretion in one
7 sense, at the same time as it helps insulate them from commercial influences in another.

8 In sum, the statutory provision here may very well be constitutional, but the Court has
9 insufficient information at this stage of the litigation to make that determination. During discovery,
10 the parties should develop the factual record including Congressional findings to enable the Court to
11 make judicial findings as discussed in the Turner decisions regarding whether the regulation furthers
12 a substantial governmental interest and whether less restrictive means are available.

13        3. Vagueness Facial Challenge (Fifth Claim)

14 Plaintiff's fifth claim alleges that section § 399b "fails to give persons of ordinary intelligence
15 adequate notice of what speech is proscribed" and thus "is unconstitutionally vague in violation of
16 the First and Fifth Amendments." FAC ¶¶ 40-41. Plaintiff's vagueness challenge is focused on the
17 clarity of the term "promote" in § 399b(a)(1).

18 Striking down a law because it is void for vagueness is not unique to First Amendment
19 jurisprudence, but is a general principle of constitutional and criminal law. See Sharkey's, Inc. v.
20 City of Waukesha, 265 F. Supp. 2d 984, 990 (E.D. Wis. 2003) (citing Rodney A. Smolla, Smolla
21 and Nimmer on Freedom of Speech § 6:13 (2003)). Where a statute's scope is capable of reaching
22 expression sheltered by the First Amendment, however, the doctrine demands a greater degree of
23 specificity than in other contexts. Id.; Smith v. Goguen, 415 U.S. 566, 573 (1974). In a vagueness
24 challenge, the court is "relegated . . . to the words of the ordinance itself, to the interpretations the
25 court below has given to analogous statutes, and, perhaps to some degree, to the interpretation of the
26 statute given by those charged with enforcing it." Grayned v. City of Rockford, 408 U.S. 104, 110
27 (1972) (citations omitted).

28     "To pass constitutional muster against a vagueness attack, a statute must give a person of

ordinary intelligence adequate notice of the conduct it proscribes." U.S. v. 594,464 Pounds of Salmon, 871 F.2d 824, 829 (9th Cir. 1989). A statute providing for civil sanctions is reviewed for vagueness with somewhat "greater tolerance" than one involving criminal penalties. Id.

California Teachers Association v. Board of Education, 271 F.3d 1141 (9th Cir. 2001) involved the appeal of a grant of summary judgment in favor of defendants, in which the teachers association and others challenged a provision of Proposition 227, Cal. Educ. Code §§ 300-340, as unconstitutionally vague and overbroad. Plaintiffs contended that the proposition was unconstitutionally vague in two principal respects: that it failed to define clearly when teachers are required to speak in English; and that it failed to define how much non-English would subject them to personal liability. Id. at 1146. After construing the initiative, the Court found that instructional speech received First Amendment protection and was entitled to heightened vagueness scrutiny. Id. at 1150.

The court then noted that a statute's vagueness exceeded constitutional limits if its "deterrent effect on legitimate expression is . . . both real and substantial, and if the statute is [not] readily subject to a narrowing construction by the state courts[.]" Id. at 1151 (quoting Young v. American Mini Theatres, 427 U.S. 50, 60 (1976)). Whether a statute's chilling effect on legitimate speech is substantial should be judged in relation to what the statute clearly proscribes. Id. (citations omitted). In other words, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes in the vast majority of its intended applications." Id. (internal quotation omitted). In analyzing the facial challenge, the court noted that "instruction" and "curriculum" are words of common understanding, and that there would be no substantial chilling effect on legitimate speech. The court also noted that the terms "nearly all" and "overwhelmingly" were not so ambiguous as to likely chill more than a negligible amount of non-English speech. Id. at 1152. The court noted that these terms were more "concrete, specific and objective" than the amorphous phrase "characterized by an emphasis" which the court found sufficiently clear in Young, 427 U.S. at 53. Id. at 1153. The court cited numerous examples of statutes affecting speech that are less than perfectly precise which have nonetheless withstood facial vagueness challenges, while using terms such as "approach" without "consent" to engage in "oral protest, education, or counseling" and

16

"when the police reasonably believe that a threat to the security or peace of the embassy is present," or prohibiting protests that "unreasonably interfere" with access to public buildings or "loud and raucous" sound amplification. Id. at 1153-54 (citations omitted).

Here, Plaintiff claims that § 399b(a)(1), which prohibits any paid message intended to promote any service, facility, or product offered by any person who is engaged in such offering for profit, is vague because of the term "promote." Opp. at 11-12. Yet the general concept of promoting a product or service is one that is easily grasped by a person of ordinary intelligence in this modern age of commercial marketing and would appear to be a term of "common understanding." Cal. Teachers Ass'n, 271 F.3d at 1152. The term is no less precise than the terms cited in California Teachers that survived facial vagueness challenges. In addition, it is not likely that any ambiguity in the terms of § 399b(a)(1) will chill any more than a negligible amount of commercial speech. See id. at 1151 (citing Bates v. State Bar of Arizona, 433 U.S. 350, 380-81 (1977) (commercial speech unlikely to be chilled because commercial entities have strong economic interest in engaging in such speech).[4]

In short, § 399b(a)(1) may well not be impermissibly vague. Whether the Court should dismiss the claim at this stage, however, is a different question. In analyzing vagueness, courts may consider the "interpretation of the statute given by those charged with enforcing it." Grayned, 408 U.S. at 110. Plaintiff may introduce evidence of the FCC's enforcement and findings as to what constitutes promotion as opposed to allowable underwriting. For example, Plaintiff cited an article that gives examples of past FCC decisions on underwriting announcements, which, according to the author, "amply demonstrate[] the subjective nature of the judgments being made and the difficulty of predicting FCC enforcement." Andrew D. Cotlar, You Said What? The Perils of Content-Based Regulation of Public Underwriting Acknowledgments, 59 Fed. Comm. L.J. 47, 55 (2006). While Mr. Cotlar's conclusion is not in itself an FCC interpretation, the FCC's own enforcement decisions

---

[4] But Defendants' reliance on Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489 (1982) (Mot. at 14:3-4) for the proposition that challenge of an economic regulation allows for a higher tolerance of vagueness is misplaced. Those plaintiffs did not challenge a law appreciably restricting constitutionally protected commercial speech, but only speech proposing an illegal transaction, which the government may ban. Id. at 496.

17

may be considered in the vagueness analysis. It would be premature to dismiss the vagueness claim before allowing Plaintiff to present this evidence.[5]

### III. CONCLUSION

Defendants' motion to dismiss is GRANTED with prejudice as to the second, fourth, sixth, seventh, eighth and ninth claims and the as-applied constitutional challenges to Section 399b in the first, third and fifth claims. The motion to dismiss is DENIED as to the facial constitutional challenges in the first, third, and fifth claims.

**IT IS SO ORDERED.**

Dated: December 21, 2007

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge

---

[5] While Plaintiff's allegations of vagueness focus on the issue of notice of what speech is prohibited, a statute may also be unconstitutionally vague if it authorizes "arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000) (citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)). In G.K. Ltd. Travel v. City of Lake Oswego, 436 F.3d 1064 (9th Cir. 2006), the court upheld summary judgment in favor of the city, where appellees challenged a sign ordinance designed to reduce visual blight and protect traffic safety. Concluding that the statute did not allow arbitrary and discriminatory enforcement, the Court noted that the City officials "are to enforce the Code as it is written and the City provides sufficient guidance in the Code's numerous sections to avoid 'delegating basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.'" Id. at 1085. The parties have not addressed this type of vagueness challenge. On the one hand, the FCC has acknowledged that it is sometimes difficult to distinguish language that "promotes" from that which merely identifies the underwriter. On the other hand, in sharp contrast to decentralized delegation to multiple ad hoc decision-makers, the FCC is a centralized expert body to whom Congress has entrusted the difficult task of regulating broadcast communications.