1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    MINORITY TELEVISION PROJECT INC.,          No. C-06-02699  EDL

9              Plaintiff,                        **ORDER GRANTING DEFENDANT'S**
                                                 **MOTION FOR SUMMARY JUDGMENT**
10       v.                                      **AND DENYING PLAINTIFF'S MOTION**
                                                 **FOR SUMMARY JUDGMENT**
11   FEDERAL COMMUNICATIONS
     COMMISSION,
12
               Defendant.
13   _____/

14          Plaintiff Minority Television Project ("Minority TV" or "Plaintiff"), a non-profit California

15   corporation, is the licensee of non-commercial educational television station KMTP-TV, San

16   Francisco, pursuant to a license granted by Defendant Federal Communications Commission

17   ("FCC").  First Amended Complaint ("FAC") ¶ 5.  As the operator of KMTP-TV, Plaintiff is subject

18   to the restrictions on broadcasting announcements acknowledging donors and the prohibition against

19   certain paid promotional announcements set forth in 47 U.S.C. § 399b and 47 C.F.R. § 73.621(e).

20   FAC ¶ 17.  Plaintiff challenges these restrictions as facially unconstitutional under the First

21   Amendment.  In particular, Plaintiff claims that the ban on paid advertisements relaying views on

22   matters of public importance or supporting or opposing political candidates facially discriminates

23   against non-commercial speech and favors certain types of commercial speech over non-commercial

24   speech.  Plaintiff also contends that the regulations restricting paid advertisements to promote

25   services, facilities, or products are unconstitutionally vague.

26          Plaintiff filed its original complaint on September 19, 2006, alleging numerous constitutional

27   causes of action.  Defendant moved to dismiss those claims.  On March 13, 2007, the Court

28   dismissed certain claims with prejudice, and the following claims with leave to amend: (1) the facial

     constitutional challenge to 47 U.S.C. § 399b (contained in the first claim) for violation of the First

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

Amendment for imposition of greater restrictions on certain non-commercial speech than on certain commercial speech; (2) the facial constitutional challenge to 47 U.S.C. § 399b (contained in the third claim) for violation of the First Amendment for imposition of greater restrictions on certain non-commercial speech than on other non-commercial speech; and (3) the facial constitutional challenge to 47 U.S.C. § 399b (contained in the fifth claim) for violation of the First and Fifth Amendments for unconstitutionally vague restrictions on protected speech.

Plaintiff filed an amended complaint on February 28, 2007, re-alleging the claims previously dismissed with prejudice as well as the facial constitutional challenges.  Defendant filed a motion to dismiss.  On December 21, 2007, the Court granted Defendant's motion with respect to the previously dismissed claims.  The Court denied Defendant's motion as to the remaining claims for relief.  The Court noted that while the prohibitions in Section 399b seemed to further the substantial interest of insulating broadcasters from special interests and ensuring high quality programming, dismissal would be premature without further development of the factual record.  See Dec. 21, 2007 Order Granting in Part and Denying in Part Defendant's Motion to Dismiss ("Dec. 21 Order") at 13-18.

The parties filed cross motions for summary judgment on the remaining claims.  For the following reasons, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

**I.       BACKGROUND**

       **A.       Regulation of Public Broadcast Stations**

Pursuant to its statutory authority to "[c]lassify radio stations" and "[p]rescribe the nature of the service to be rendered by each class of licensed stations," 47 U.S.C. § 303(a)-(b), the FCC has set aside certain channels to be "licensed only to nonprofit educational organizations upon a showing that the proposed stations will be used primarily to serve the educational needs of the community . . . and to furnish a nonprofit and noncommercial television broadcast service," 47 C.F.R. § 73.621(a).  Such stations are referred to as noncommercial educational stations or public broadcast stations.  47 U.S.C. § 397(6).

In regulating public broadcast stations, Congress and the FCC have sought to strike "a

2

reasonable balance between the financial needs of [those] stations and their obligation to provide an essentially non-commercial broadcast service." In re Comm'n Policy Concerning the Noncommercial Nature of Educ. Broad. Stations, 90 F.C.C. 2d 895, 897 ¶ 3 (1982) (internal quotations omitted) (hereinafter "Educ. Broad. Stations"). Congress enacted Section 399b as part of the Public Broadcasting Amendments Act of 1981. To help fund programming, 47 U.S.C. § 399a(b) allows non-commercial educational stations to identify their financial supporters in a manner that does not promote the sale of goods or services. A non-commercial educational station may thus "broadcast announcements which include the use of any business or institutional logogram and which include a reference to the location of the corporation, company or other organization involved," so long as such announcements do not "interrupt regular programming." 47 U.S.C. § 399a(b).[1]

Such stations may not, however, "make its facilities available to any person for the broadcasting of any advertisement." 47 U.S.C. § 399b(b)(2). The challenged statute defines "advertisement" as follows:

> For purposes of this section, the term "advertisement" means any message or other programming material which is broadcast or otherwise transmitted in exchange for any remuneration, and which is intended–
>
> > (1) to promote any service, facility, or product offered by any person who is engaged in such offering for profit;
> >
> > (2) to express the views of any person with respect to any matter of public importance or interest; or
> >
> > (3) to support or oppose any candidate for political office.

47 U.S.C. § 399b(a). Section 399b thus regulates both "commercial" speech (§ 399b(a)(1)) and "non-commercial" speech (§ 399b(a)(2) and (3)), to the extent such programming material is broadcast in exchange for remuneration. As this Court previously recognized, this statutory framework strikes "a balance that affords broadcasters financing beyond federal appropriations, while maintaining insulation from special influences, whether commercial or political." Dec. 21

---

[1] A logogram is "any aural or visual letters or words, or any symbol or sign, which is used for the exclusive purpose of identifying any corporation, company, or other organization, and which is not used for the purpose of promoting the products, services or facilities of such corporation, company, or other organization." 47 U.S.C. § 399a(a).

1    Order at 12.

2        The FCC promulgated 47 C.F.R. § 73.621(e) to implement the statute and has issued several

3    orders describing types of sponsorship announcements that do or do not violate the statute's

4    prohibition on advertising.  Donor acknowledgments may include: "(1) logograms or slogans which

5    identify and do not promote, (2) location information, (3) value neutral descriptions of a product line

6    or service, and (4) brand and trade name and product o[r] service listings."  In re Comm'n Policy

7    Concerning the Noncommercial Nature of Educ. Broad. Stations, 7 F.C.C. Rcd 827 (1992).  Donor

8    announcements, however, may not include price information, calls to action, or inducements to buy.

9    Id. at 828.

10        **B.    FCC Proceedings Against Plaintiff**

11        Minority TV is the licensee of non-commercial educational television stations KMTP-TV,

12    located in San Francisco.  KMTP-TV is one of only a handful of non-commercial stations that are

13    not affiliated with the Public Broadcasting Service ("PBS").  Declaration of Roger Noll, Ex. A at 22.

14    In the course of its operations, Plaintiff has broadcast a number of announcements identifying its

15    donors.  As a consequence of complaints from another broadcaster, the FCC commenced a

16    proceeding against Plaintiff for repeatedly going beyond the limited identification of donors

17    permitted under 47 U.S.C. § 399b.  In 2002, the FCC's Enforcement Bureau determined that

18    Minority TV violated Section 399b approximately 1,900 times by broadcasting promotional

19    advertisements on behalf of corporations such as State Farm and Chevrolet, among others.  FAC,

20    Ex. A (Notice of Apparent Liability for Forfeiture, 17 FCC Rcd 15646 (2003)) (broadcasting, for

21    example, advertisements with phrases such as "highly regarded product").

22        The FCC found "that Minority Television Project, Inc. ("Minority"), licensee of non-

23    commercial educational television station KMTP-TV, San Francisco, California, apparently violated

24    Section 399b of the Communications Act of 1934, as amended ("the Act"), 47 U.S.C. § 399b, and

25    Section 73.621 of the Commission's Rules, 47 C.F.R. § 73.621, by willfully and repeatedly

26    broadcasting advertisements.  Based on our review of the facts and circumstances of this case, we

27    conclude that Minority is apparently liable for a monetary forfeiture in the amount of Ten Thousand

28    Dollars ($10,000)."  FAC, Ex. A.

4

1    The FCC followed with a Forfeiture Order for $10,000.00 for "willful and repeated broadcast

2   of advertisements over the station, in violation of Section 399b of the Communications Act of 1934,

3   as amended ("the Act"), and section 73.621(e) of the Commission's rules." FAC, Ex. B (Forfeiture

4   Order, 18 FCC Rcd 26661 (2003)). In doing so, the Forfeiture Order acknowledged that "the

5   Commission has recognized that 'it may be difficult to distinguish at times between announcements

6   that promote and those that identify.' Thus it defers to 'reasonable, good faith judgments' by

7   licensees and finds violations only where material is 'clearly' promotional as opposed to

8   identifying." Id.

9    The FCC denied Plaintiff's Petition for Review, specifically rejecting Plaintiff's First

10   Amendment arguments and request that the Commission revisit its underwriting announcement rules

11   to make them clearer. FAC, Ex. C (Order on Review, 19 FCC Rcd 25116 (2004)). The FCC also

12   denied Plaintiff's Petition for Reconsideration. FAC, Ex. D.

13    On December 23, 2005, Plaintiff filed a Petition for Review of the FCC orders in the United

14   States Court of Appeals for the Ninth Circuit. On April 18, 2006, the Ninth Circuit transferred the

15   case to this Court. See Docket No. 1 (Transfer Order).

16    The parties agree that the above material facts are undisputed. Minority TV has not

17   submitted evidence to support its constitutional challenge. Instead, it argues that neither the

18   evidence before Congress nor Defendant's evidence before the Court supports the constitutionality

19   of the statute.

20   **II.    LEGAL STANDARD**

21    Summary judgment shall be granted if "the pleadings, depositions, answers to

22   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

23   genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

24   law." FRCP 56(c). Material facts are those that may affect the outcome of the case. See Anderson

25   v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there

26   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The

27   court must view the facts in the light most favorable to the non-moving party and give it the benefit

28   of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith

United States District Court
For the Northern District of California

1   Radio Corp., 475 U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the

2   truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v. Carson

3   City, 180 F.3d 1047, 1054 (9th Cir. 1999).

4           A party seeking summary judgment bears the initial burden of informing the court of the

5   basis for its motion, and of identifying those portions of the pleadings and discovery responses that

6   demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

7   323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

8   demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

9   where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

10  merely by pointing out to the district court that there is an absence of evidence to support the

11  nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party must

12  then set forth specific facts showing that there is some genuine issue for trial in order to defeat the

13  motion.  See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.  If the nonmoving party fails to show

14  that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."

15  Celotex, 477 U.S. at 323.

16  **III.     CROSS MOTIONS FOR SUMMARY JUDGMENT**

17          **A.     Standing**

18          To demonstrate standing, a plaintiff "must allege (1) a 'distinct and palpable' injury-in-fact

19  that is (2) 'fairly traceable' to the challenged provision or interpretation and (3) would 'likely . . . be

20  redressed' by a favorable decision."  Santa Monica Food Not Bombs v. City of Santa Monica, 450

21  F.3d 1022, 1033 (9th Cir. 2006) (internal citation omitted).  Additionally, special standing principles

22  apply in First Amendment cases.  In a facial challenge, a plaintiff seeking to vindicate his own

23  constitutional rights may argue that an ordinance "is unconstitutionally vague or . . . impermissibly

24  restricts a protected activity."  Alternatively, "an individual whose own speech or expressive

25  conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face

26  because it also threatens others not before the court."  Id. (citations omitted).

27          Defendant does not contest Plaintiff's standing.  Plaintiff plainly has standing to challenge

28  Section 399b(a)(1), as the FCC has found it violated that section.  Plaintiff maintains that it also has

standing to challenge Sections 399b(a)(2) and (3), noting that the FCC has conceded that it has

enforced Section 399b(a)(3) and admits that it will enforce both sections where appropriate.  The

FCC has also issued at least one advisory opinion concluding that an underwriting announcement for

Planned Parenthood was permissible under Section 399b(a)(1) because Planned Parenthood was a

non-profit and under Section 399b(a)(2) because the announcement was not an expression of the

views of any person with respect to a matter of public importance or interest.  See Diercks Affidavit,

Ex. A; Scheibel Depo. Ex. 18.  The FCC has initiated enforcement pursuant to Section 399b(a)(3) at

least twice, and the FCC is not aware of any published decisions enforcing Section 399b(a)(2).  Fed.

Mot. at 19 n.5 (citing Applications of WQED Pittsburgh, 15 FCC Rcd 202, 209 (1999); J.C.

Maxwell Broadcasting Group, Inc., 7 FCC Rcd 3218 (1992)).

Since the FCC is generally enforcing the provisions, Plaintiff has standing.  In addition,

while Plaintiff has not introduced specific evidence that it has a real intention or desire to broadcast

announcements that would violate subsections (a)(2) and (a)(3) of Sections 399b, Plaintiff has

alleged such an intention, discovery has not shown otherwise, and Defendant has not contested

Plaintiff's claim.

## B.    Whether Section 399b Violates the First Amendment

As the Court has already determined, Section 399b is subject to review under intermediate

First Amendment scrutiny and will be upheld if it is "narrowly tailored to further a substantial

government interest."  FCC v. League of Women Voters of California, 468 U.S. 364, 380 (1984)

(internal quotations omitted).[2]  Under this test, "the government may employ the means of its

choosing so long as the . . . regulation promotes a substantial government interest that would be

achieved less effectively absent the regulation, and does not burden substantially more speech than

is necessary to further that interest."  Turner Broadcasting Sys. v. FCC, 520 U.S. 180, 214-15 (1997)

("Turner II") (internal quotation omitted).  The regulation need not be the least restrictive means to

achieve the government's end.  Id. at 217.  "When the Government defends a regulation on speech

as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the

---

[2]    While Plaintiff halfheartedly argues that strict scrutiny should apply, FCC v. Fox Television Stations, Inc., __ U.S. __, 129 S. Ct. 1800 (2009), relied upon by Plaintiff, does not support Plaintiff's conclusion.

7

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

existence of the disease sought to be cured.' (citation omitted).  It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  Turner Broad. Sys. v. FCC, 512 U.S. 622, 664 (1994) ("Turner I") (citations omitted).  Accordingly, the Court must consider the question of "whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress."  Turner I, 512 U.S. at 665-66; Turner II, 520 U.S. at 211.  Where the evidence in the record could support opposite conclusions, "it [i]s for Congress to determine the better explanation," and the Court is "not at liberty to substitute [its] judgment for the reasonable conclusion of a legislative body."  Turner II, 520 U.S. at 212; see also Turner I, 512 U.S. at 666 (citing Century Communications Corp. v. FCC, 835 F.2d 292, 304 (D.C. Cir. 1987) ("When trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures.").  See generally Dec. 21 Order at 8-11.

Here, there are a few threshold issues which the Court must address before analyzing whether or not the statute is narrowly tailored to further a substantial governmental interest.  First, the parties dispute whether or not the Court may consider facts outside of those considered by Congress when it enacted the statute.  The government has submitted a report by Roger G. Noll, a Professor of Economics at Stanford University, and a declaration by Lance Ozier, the Vice President for Planning and Policy of the WGBH Educational Foundation, neither of which was considered by Congress.

As Defendant notes, in Turner I, the Supreme Court expressly permitted the government to supplement the legislative record to support the constitutionality of a federal statute, and indeed remanded the case for that very purpose.  Turner I, 512 U.S. at 668 ("Because of the unresolved factual questions, the importance of the issues to the broadcast and cable industries, and the conflicting conclusions that the parties contend are to be drawn from the statistics and other evidence presented, we think it necessary to permit the parties to develop a more thorough factual record, and to allow the District Court to resolve any factual disputes remaining, before passing upon the constitutional validity of the challenged provisions.").  In Turner II, the Court held: "We

8

1  have no difficulty in finding a substantial basis to support Congress' conclusion that a real threat

2  justified enactment of the must-carry provisions.  We examine first the evidence before Congress

3  and then the further evidence presented to the District Court on remand to supplement the

4  congressional determination." Turner II, 520 U.S. at 196.  The Supreme Court stated that the

5  evidence before Congress supported its conclusions, and "the reasonableness of Congress'

6  conclusion was [also] borne out by the evidence on remand." Id. at 200.  In accordance with the

7  Turner decisions, this Court has considered both evidence before Congress and additional evidence

8  not before Congress in evaluating the reasonableness of Congress' decision.[3]

9          Plaintiff also argues that the Ozier declaration should be stricken because the government

10  did not identify Mr. Ozier as an expert pursuant to Federal Rule of Civil Procedure 26(a)(2).  Mr.

11  Ozier's testimony qualifies as lay opinion testimony under Federal Rule of Evidence 701 if it is

12  rationally based on his perception, helpful to a clear understanding of the witness' testimony or the

13  determination of a fact in issue, and not based on scientific, technical, or other specialized

14  knowledge.  Most if not all of Mr. Ozier's testimony is based upon his particularized knowledge that

15  he has by virtue of his or her position in a business, as opposed to training or specialized knowledge

16  within the realm of an expert, and is lay opinion.  See Fed. R. Evid. 701 adv. comm. note (2000).  As

17  the Vice President of a foundation that operates numerous noncommercial educational radio and

18  television stations, as well as the prior underwriting director of that entity, his opinions are based

19  largely on his role at WGBH.  See Ozier Decl. ¶¶ 2-4.  In addition, the Federal Rules of Civil

20  Procedure provide that a party that does not identify a witness may still use that witness if the failure

21  to disclose is harmless.  See Fed. R. Civil Pro. 37(c)(1).  Here, in February 2009, the government

22  identified Mr. Ozier in a Rule 26(a)(1) disclosure as having information regarding the effect that

23  airing of advertising or underwriting announcements from commercial, non-commercial or political

24

25          [3]  Plaintiff argues that the Court cannot consider evidence outside of the congressional record
if that record revealed that Congress did not have substantial evidence before it supporting its
26  conclusion.  See Turner II, 520 U.S. at 211 ("question is whether the legislative conclusion was
reasonable and supported by substantial evidence in the record before Congress") (citing Turner I, 512
27  U.S. at 665-666 ).  Because the Court finds that there was substantial evidence in the record before
Congress, as discussed below, the Court need not reach this issue.  Plaintiff also maintains that a
28  plaintiff could successfully challenge a statute if overwhelming evidence contradicted the evidence
before Congress.  Again, however, Plaintiff has not submitted any significant contradictory evidence
here, so the Court need not address this hypothetical scenario.

sources would have on public broadcast stations, and Defendant made him available for a deposition, which Plaintiff declined to take. Consequently, the failure to disclose him as an expert is harmless. The Court, therefore, has considered Mr. Ozier's testimony, although it would reach the same conclusion without it.

As an additional threshold matter, the parties dispute whether or not, "[w]here the First Amendment is implicated the tie goes to the speaker, not the censor." Pl. Opp. at 3 (quoting FEC v. Wisconsin Right to Life, 551 U.S. 449, 127 S. Ct. 2652 (2007) ("WRTL")).[4] Plaintiff claims this principle should be applied here, at least to the extent political speech is involved, but the government counters that WRTL is inapposite because there, strict scrutiny applied, requiring the government to use the least restrictive means to achieve its goal. Here, by contrast, the Court must give considerable deference to Congress in examining the evidence before it under Turner II, 520 U.S. at 199, rather than simply apply the "tie goes to the speaker" rule. The Court agrees that the WRTL strict scrutiny test is inapplicable here, where the government need not choose the least restrictive means to achieve its goal.

Turning to the constitutionality of the statute, the government argues that Section 399b's restrictions on the broadcast of political and issue advertisements for remuneration are a narrowly tailored means of advancing the government's substantial interest of insulating broadcasters from special interests and ensuring high quality programming. Fed. Mot. at 6. The government maintains that the allure of remuneration from special influences, whether commercial or political, would undermine the touchstone of the noncommercial educational service – the independence of the public broadcaster's programming judgment. Id. In response, Plaintiff argues that Congress passed the statute on an insufficient factual record, and that the statute does not pass intermediate scrutiny.

---

[4]   In WRTL, a nonprofit political advocacy corporation asserted that the organization's advertisements were not barred by the Bipartisan Campaign Reform Act of 2002 ("BCRA"). Id. at 460. The Court found that the BCRA unconstitutionally precluded the advertisements, but there was no majority consensus concerning the basis for the unconstitutionality. Two Justices found that the specific advertisements at issue were not the functional equivalent of express campaign speech, and that the BCRA was unconstitutional as applied to them, while three other Justices deemed the specific statutory prohibition to be facially unconstitutional, and would have overruled the Court's prior holding that the BCRA was constitutional. Id. at 483, 504.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

2
      **1.**      **The Government's Substantial Interest in Preserving Public**
3
      **Broadcasting as a Source of Programming Unavailable on**
      **Commercial Stations**

4

5
Congress has recognized that "it is in the public interest to encourage the growth and

6
development of public radio and television broadcasting, including the use of such media for

7
instructional, educational, and cultural purposes." 47 U.S.C. § 396(a)(1). The FCC first set aside

8
TV channels for the exclusive use of educational broadcasters on the basis of its conclusion that

9
"there is a need for non-commercial education stations" and that such stations can make "important

10
contributions … in the education of the in-school and adult public." <u>Television Assignments</u>, 41

11
F.C.C. 148, 159-160 ¶¶ 36-38 (1952). The FCC dedicated these stations in this manner because of

12
the "high quality type of programming which would be available in such stations – programming of

13
an entirely different character from that available on most commercial stations." <u>Nat'l Pub. Radio,</u>

14
<u>Inc. v. FCC</u>, 254 F.3d 226, 227 (D.C. Cir. 2001) (internal citations and quotations omitted).

15
Congress has recognized the unique programming niche filled by public television by

16
finding, in the Public Television Act, that "[i]t furthers the general welfare to encourage public

17
telecommunications services which will be responsive to the interests of people both in particular

18
localities and throughout the United States, which will constitute an expression of diversity and

19
excellence, and which will constitute a source of alternative telecommunications services for all the

20
citizens of the Nation." 47 U.S.C. § 396(a)(5); <u>see also</u> 47 U.S.C. § 396(a)(6) (referring to the

21
public interest in seeking to "encourage the development of programming that involves creative

22
risks and that addresses the needs of unserved and underserved audiences, particularly children and

23
minorities"). To achieve these goals, Congress has appropriated substantial funds over the years for

24
non-commercial broadcasting. <u>See, e.g.</u>, 47 U.S.C. § 396(k). It also created the Corporation for

25
Public Broadcasting ("CPB") in order to "facilitate the full development of public

26
telecommunications" and make available "programs of high quality, diversity, creativity, excellence,

27
and innovation." 47 U.S.C. 396(g)(1)(a).

28
The government submitted expert opinion regarding how public broadcasting addresses

certain programming voids that exist in commercial broadcasting due to its financial incentive

**United States District Court**
For the Northern District of California

structure.  Roger Noll, a Professor *Emeritus* of Economics at Stanford University and a Senior

Fellow at the Stanford Institute for Economic Policy Research, explained persuasively that public

broadcasting alleviates an "inherent 'market-failure' in commercial, advertiser-supported

broadcasting," which "causes the nature and diversity of content in programs to fall short of the

social optimum."  Expert Report of Roger G. Noll ("Noll Report") at 5; see also id. at 25-27 (citing

studies comparing program diversity and program content of commercial and non-commercial

stations).  The market failure in commercial broadcasting results from the fact that commercial

broadcasters derive most of their revenue from advertising sales.  Id. at 11.  "Advertisers buy access

to viewers and are interested only in whether potential customers are watching," and they "have no

interest in the size of the benefit that a program provides viewers as long as that benefit is sufficient

to keep them viewing."  Id.  Commercial broadcasters therefore have an incentive to create and

broadcast programming that appeals to the largest possible audience because "[a]dvertising revenues

from for-profit advertisers depend upon the expected viewership of a particular program."

Declaration of Lance Ozier ("Ozier Decl.") ¶12; see also Turner II, 520 U.S. at 208 ("a television

station's audience size directly translates into revenue – large audiences attract larger revenues,

through the sale of advertising time.").  The net effect "is that a competitive, advertiser-supported

television system leads to an emphasis on mass entertainment programming with insufficient

attention to programs that serve a small audience, even if that audience has an intense desire to

watch programs that differ from standard mass entertainment programs."  Noll Report at 5; see also

Ozier Decl at ¶15.

By contrast, public broadcasting's increased diversity of programming is made possible by

different financial incentive structures, which "arise primarily from the prohibition against

advertisements on non-commercial broadcasting and the practice of making federal subsidies depend

on a station's success in obtaining financial support from other sources."  Noll Report at 5.  Unlike

commercial stations, non-commercial educational stations receive funding not from paid advertising

but from federal and state subsidies, individual donors, special events, foundation grants, and

corporate contributions that are primarily in the form of payments for underwriting announcements

that acknowledge the donation before or after a sponsored program.  Noll Report at 16-17; Ozier

**United States District Court**
For the Northern District of California

Decl at ¶6.  The FCC's interest in creating noncommercial channels is "to remove the programming decisions of public broadcasters from the normal kinds of commercial market pressures under which broadcasters … usually operate."  In re Comm'n Policy Concerning the Noncommercial Nature of Educ. Broad. Stations, 86 F.C.C.2d 141, 142 (1981) ("Pub. Broad. Serv.").  Unlike commercial stations, "non-commercial educational stations do not attempt to shape editorial content to maximize viewership for the programs that they offer, but instead attempt to air programs with particular qualities consistent with their educational mission." Ozier Decl. ¶12.  The relative absence of advertising pressures allows the viewing public to rely on public television for "program content that is unlike the content of commercial stations and networks, which in turn is the kind of content that is of less interest to advertisers."  Noll Report at 29.  For this reason, the FCC has recognized a "compelling government interest in separating public broadcasting station programming decisions from commercial considerations as much as possible." Pub. Broad. Serv., 86 F.C.C.2d at 147.

Non-commercial programming differs from commercial programming in a number of ways. In particular, non-commercial broadcasters provide more public affairs programming and children's and family programming, while showing significantly less violent programming.  Noll Report at 25-27.  Studies have found the children's programming on public stations better serve certain educational and instructional criteria than children's programming on non-public stations.  Id. at 33-34.

A strong example of public broadcasting's special benefits is provided by children's programming, which continues to be largely absent from commercial stations.  The Government Accountability Office has determined that children's programming accounts for 16 percent of all program hours broadcast by public television stations and represents "over 40 percent of the weekday programming schedule for many stations."  Id., Ex. B at 22 (Issues Related to the Structure and Funding of Public Television, GAO-07-150 (Jan. 2007)).  Commercial broadcasters, by contrast, have been found to average about 3.32 hours *per week* of educational or informational children's programming.  Id., Ex. C at 11 (Wilson, Barbara J., Kunkel, Dale, and Drogos, Kristin L., Educationally/Insufficient? An Analysis of the Availability & Educational Quality of Children's E/I Programming, Children Now (November 2008)).  According to a Senate report, public television is

United States District Court
For the Northern District of California

1  "the primary source of educational children's programming in the United States."  Children's

2  Television Act of 1990, S. REP. NO. 101-66, at 3, reprinted in 1990 U.S.C.C.A.N. 1628, 1633.

3  Among other things, public broadcasting has served as an incubator for acclaimed children's

4  programs such as "Mister Roger's Neighborhood," "Sesame Street," "Electric Company," "3-2-1

5  CONTACT," "Square One TV," and "Reading Rainbow" that educate and teach children specific

6  skills.  Id. at 23-26, 1990 U.S.C.C.A.N. at 1631-33 (citing studies, that for example, show that

7  "viewing Mister Rogers Neighborhood leads to increased prosocial behavior, task persistence and

8  imaginative play" and that "[e]ven a skeptical interpretation of the data concluded that children

9  learned letter and number skills from unaided viewing").

10     Therefore, the government notes that it has a substantial interest in maintaining the

11  educational programming available on public stations, which are heavily subsidized by the

12  government.  Congress's intent in amending sections 399a and 399b in 1981 was to insulate public

13  broadcasting from special interest influences, including political and commercial influences.  127

14  Cong. Rec. 13145 (June 22, 1981) (remarks of Rep. Gonzalez).   Plaintiff has not even attempted to

15  refute this point.  Rather, Plaintiff maintains that Section 399b does not further the asserted

16  governmental interest and is not narrowly tailored.

17         2.     **Whether § 399b Furthers the Government's Interest and is
                         Narrowly Tailored**

18

19     In analyzing whether Section 399b furthers a substantial governmental interest, the

20  government must demonstrate that the recited harms are real, not merely conjectural, and that the

21  regulation will in fact alleviate these harms in a direct and material way."  Turner Broad. Sys. v.

22  FCC, 512 U.S. 622, 664 (1994) ("Turner I") (citations omitted).  Accordingly, the Court must

23  consider the question of "whether the legislative conclusion was reasonable and supported by

24  substantial evidence in the record before Congress."  Turner I, 512 U.S. at 665-66; Turner II, 520

25  U.S. at 212.

26     When the FCC established noncommercial television half a century ago, it found that the

27  "achievement of the objective for which special educational reservations have been established –

28  i.e., the establishment of a genuinely educational type of service – would not be furthered by

14

United States District Court
For the Northern District of California

permitting [non-commercial stations] to operate in substantially the same manner as commercial applicants ." Television Assignments, 41 F.C.C. 148, 166 ¶ 57 (1952).  Thirty years later, the FCC noted that "[p]ublic stations have relied primarily on government and private contributions; private commercial stations have relied primarily upon revenue paid in consideration for the airing of advertising to promote goods and services.  So long as [that distinction] is maintained …,programming broadcast in return for receipt of consideration and used to promote the sale of goods and services is not appropriate for non-commercial broadcasting."  Pub. Broad. Serv., 86 F.C.C.2d at 147.

Until shortly before Congress adopted Section 399b's advertising restrictions, the FCC's existing regulations only allowed broadcasting of a sponsor's name on a public station.  In adopting Section 399b, Congress struck a balance between the need to ensure that public broadcasting remained financially viable in the face of substantial federal funding reductions and the need to preserve its essential character as a non-commercial, educational service.  Accordingly, Congress allowed public stations to broadcast "logograms" identifying their corporate financial sponsors.  See 47 U.S.C. § 399a.  But Congress heard testimony that "to put direct advertising messages on the air . . . would tend to blur the distinction between [noncommercial] and commercial stations."  Hearings before the Subcomm. on Telecommns, Consumer Protection, and Finance of the H. Comm. on Energy and Commerce on H.R. 3238 and H.R. 2774, 97th Cong. 1st Sess. 229 (1981) (testimony of David Ives, president of WGBH-TV Boston) (1981 House Hearings).[5]

In other words, when Congress adopted Section 399b, Congress loosened somewhat the existing limitations on public broadcasters.  Congress had many years of experience behind it regarding the benefits of public radio and television, which had existed with even greater advertising

_____

[5]    Shortly before the 1981 House hearings on Section 399b, the FCC changed its regulations to allow non-commercial broadcasters to convey information that is informational, though not promotional, including the donor's logo, location, and product lines or services.  See Pub. Broad. Serv., 86 F.C.C.2d at 155.  In enacting this change, which was ratified by Congress in Section 399a, the FCC hoped to "increase both the total contributions and the number of individual contributors to stations" in order to "reduce the ability of any single, private or public entity to affect programming decisions" and to "help ensure that public stations provide an alternative programming service to the commercial programming service." 1981 House Hearings at 37 (testimony of FCC Commissioner Washburn).

**United States District Court**
For the Northern District of California

1   restrictions.  Congress did not write on a blank slate when it enacted Section 399b; rather, after a

2   half-century of experience with public broadcasting, the record before Congress showed that public

3   television and radio stations carry very different programming than do commercial stations.

4   Congress, therefore, was aware of the stark differences in programming which arose from

5   differences in funding between commercial and non-commercial stations, including the absence of

6   commercial pressures on public stations.

7           Congress also heard evidence that the advertising prohibitions were necessary to preserve

8   the unique programming presented by public stations.  For example, one witness testified that

9   "commercialization of public broadcasting" threatened to re-focus its programming toward the

10  "lowest common denominator," rather than "diverse audiences," including "minorities and women"

11  as well as "to the print handicapped."  1981 House Hearings, at 129-130 (testimony of John C.

12  DeWitt, American Found. for the Blind).  When asked about National Public Radio ("NPR"), Walda

13  Roseman, Senior Vice President of NPR testified that public radio allows "7 or 15 minutes to

14  explore an issue, rather than being confined to the 30-60- and 90 second snatches common to

15  commercial stations," provides "the only network for the blind," and "gives you jazz live" and

16  "theatre."  Id. at 323.  Public radio also provides four hours of daily news of a different nature than

17  that provided by commercial stations, for example covering Congressional hearings live and

18  examining the Jonestown events in depth, among other things.  Id.  While Plaintiff contends that

19  NPR's witness lacked support for her statement that allowing on-air advertising would not benefit

20  public radio, her statement was based upon NPR's study of the issue.  Diercks Decl., Ex. 1 at 212.

21          Similarly, when Congress later examined children's programming after enacting Section

22  399b,[6] its members found that "the marketplace has simply failed to produce [educational children's

23  programming] on its own, in large part because the advertiser-driven television industry does not

24  find children's programming to be a particularly lucrative venture." 136 Cong. Rec. 18242 (daily ed.

25  July 19, 1990) (remarks of Sen. Wirth) (further noting that the need for a program to promote

26  educational children's programming "has been clearly demonstrated over the years"); see also S.

27

28          [6]      The Court may consider evidence outside of the Congressional record, including
    testimony before Congress post Section 399b enactment, as noted above.

**United States District Court**
For the Northern District of California

REP. NO. 101-66, <u>reprinted in</u> 1990 U.S.C.C.A.N. 1628, 1639 ("Commercial broadcasters have little incentive to produce or carry [children's educational] programming because of the high cost of producing the programs and the low level of advertising revenue the programming generates."). "[P]ublic television is the primary source of children's educational programming in the United States." <u>Id</u>. at 1633; <u>see also</u> 136 Cong. Rec. 18241 (daily ed. July 19, 1990) (remarks of Sen. Wirth) ("[E]ducational [children's] programs have literally disappeared from the airwaves on all but PBS stations.").

Subsequent testimony before Congress also confirmed that many children's programs would not be broadcast but for non-commercial television. When asked whether the classic children's program "Sesame Street" would be "able to get a good time slot and get advertisers" if it "decided to go commercial," the President and Chief Operating Officer of Children's Television Workshop responded that "in the 20 years that we have been at Sesame Street, to my knowledge commercial broadcasters have not expressed very much interest in wanting our show on a normal basis in terms of advertising." <u>Hearing Before the Subcomm. on Communications of the S. Comm. on Commerce, Science, and Transportation</u>, 101st Cong., 1st Sess. 81-82 (1989) (testimony of David Britt). Commercial broadcasters "certainly would not give us twice a day scheduling, because children's programming is the least profitable programming that they have. And in most public television stations we get at least two hours a day in the time slot that we want." <u>Id</u>.

Representative Wirth explained:

> If we get public broadcasting into the selling of time, how do we avoid then getting public broadcasting, as I believe somebody mentioned 3 weeks ago, into a very large commitment of their own to figure out what demographics they are touching or what the measurement is going to be of that particular population, and how much X program sells for and how much Y program sells for? And the minute you get into that … you are really threatening … the independence of public broadcasting, and you … then automatically get into the ratings game. And pretty soon people are going to be comparing PBS to CBS, NBC, and ABC.

1981 House Hearings at 71. <u>See also id.</u> at 149 (testimony of Association of Independent Video and Filmmakers, Inc.) (noting that advertising will cause program choices to be made on the "basis of the needs of the sponsor, not the public").

Plaintiff argues that the evidence before Congress does not show that allowing

**United States District Court**
For the Northern District of California

1   advertisements on public stations would eviscerate the distinction between commercial and non-

2   commercial stations.  Pl. Mot. at 12.  Plaintiff argues that Defendant's admission that public stations

3   already carry advertisements under Section 399b in the form of logograms undercuts their argument.

4   But Plaintiff's argument that advertisement is an all-or-nothing proposition is not supported by any

5   evidence.  Rather, Plaintiff's claim that Congress improperly adopted the theory that you can be "a

6   little bit pregnant" (see Pl. Reply at 6) when it enacted Section 399b and therefore must allow for

7   more advertising is an inapt analogy in this legislative context; enacting laws is not an all-or-nothing

8   proposition, but instead often involves weighing competing interests and striking an appropriate

9   balance.  Plaintiff has submitted no evidence showing that allowing limited underwriting

10  announcements, product descriptions, or logograms has significantly altered the nature of public

11  programming.  Yet, allowing full-blown advertising on commercial stations has been shown over

12  many years, both before and after Section 399b was enacted, to yield starkly different programming

13  on commercial stations than that on public stations.  In other words, while Plaintiff argues that the

14  list of possible problems with permitting non-commercial stations to broadcast advertisements is

15  speculative, commercial station content is itself evidence of what programming could be expected to

16  look like if full-blown advertising were allowed.  In addition, the testimony before Congress

17  included testimony of representatives of the Association of Independent Video and Filmmakers and

18  National Public Radio, all of whom had expertise in public broadcasting.

19          Plaintiff argues that Congress adopted Section 399b in an environment "full of speculation,

20  surmise and conjecture about possible problems if noncommercial stations were permitted to

21  broadcast advertising."  Pl. Mot. at 6.  However, as noted above, Congress enacted Section 399b

22  after a half-century of experience in both public broadcasting and commercial broadcasting.

23  Testimony before Congress showed that public television stations have very different programming

24  than do commercial stations.  This difference in programming arose in the absence of ordinary

25  commercial advertisements on public stations.  Therefore, Congress's conclusions were not based on

26  mere speculation and conjecture, but on reasoned legislative judgment.  If hypothetically Congress

27  had instead arrived at the same conclusion without such experience, Plaintiff would have a stronger

28  argument requiring Congress to assemble a more extensive factual record on which to base its

1   conclusions.  But Congress did have a long history on which to base its deductions and inferences,

2   and it reasonably predicted that advertising restrictions were necessary to preserve the unique

3   programming presented by non-commercial stations.

4          As the Supreme Court has recognized, "[s]ound policymaking often requires legislators to

5   forecast future events and to anticipate the likely impact of these events based on deductions and

6   inferences for which complete empirical support may be unavailable."  Turner I, 512 U.S. at 665.

7   While Congress must base its conclusions upon substantial evidence, "deference must be accorded

8   to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest

9   [courts] infringe on traditional legislative authority to make predictive judgment when enacting

10  nationwide regulatory policy."  Turner II, 520 U.S. at 196.  Moreover, Congress may enact

11  protective legislation to avoid foreseeable problems, and it need not "wait until the entire harm

12  occurs" and may act to prevent it.  Id. at 212.

13         Plaintiff also argues that sponsors of noncommercial stations are still "free to give the money

14  to non-commercial stations and to attempt to 'buy' influence" in that manner, regardless of whether

15  they have paid for advertising.  Pl. Mot. at 13.  But the strict limitations on advertising exist to

16  insulate public stations from dependence on advertising dollars and to preserve the independence of

17  their programming decisions.  Preserving diverse sources of funding helps insulate those same

18  stations from those who might attempt to buy influence.  In any event, Plaintiff cites no facts or

19  evidence showing that the supposed ability of groups and individuals to "buy" influence in non-

20  commercial stations has affected the quality of public programming.

21         Furthermore, additional material before the Court demonstrates that the legislative

22  conclusions are supported by substantial evidence.  The Temporary Commission on Alternative

23  Financing for Public Telecommunications ("TCAF") was charged with examining the feasibility of

24  public broadcasting advertising through a limited advertising demonstration program after Congress

25  passed Section 399b.  It explored financing options to maintain, enhance, and expand public

26  broadcast services to the American people, and as part of that task, it oversaw an experiment in

27  which some public television stations were permitted to broadcast advertisements under certain

28  restricted conditions.  Pl.'s Mot., Ex. C at i.

The October 1983 report concluded that the benefit to noncommercial stations of broadcasting commercial advertising "does not balance the potential risks identified in this report. In sum, the demonstration program indicated that potential revenues from advertising are limited in scope, while it did not show that significant risks to public broadcasting clearly would be avoidable." Id. at iii.  TCAF therefore recommended continuing the advertising prohibition unless it could be established that the overall benefits to public broadcasting would exceed the costs and that stations that chose not to carry limited advertising would not share the risks associated with advertising while not receiving direct benefits. Id. at iv.

Plaintiff attacks TCAF's October 1983 Report's findings, arguing that the factual results of the only experiment where public broadcasters actually aired paid commercials refute the conclusion that paid advertising affects programming. Pl. Mot. at 12-13.  Specifically, Plaintiff notes that TCAF:

> discovered no negative impact on viewing patterns, numbers of subscribers, or contributions except that the data did raise a question concerning a possible adverse impact on the average contribution per subscriber.  Also, under the conditions of the experiment, the Commission found no advertising-related effects on programming.

Pl. Mot., Ex. C at ii.  However, as the government notes, the conditions of the experiment were artificial, involving agreements to freeze labor and copyright costs under the assurance that such freezes would not constitute precedent if limited advertising were later allowed. Id. at 14, 37. TCAF also noted that the risks associated with limited advertising could not be restricted solely to the public stations who chose to advertise. Id. at 14.

Plaintiff criticizes TCAF's ultimate findings as being conclusory and speculative, pointing to a dissent to the TCAF's recommendations which argued that the majority minimized quantitative data regarding the benefits of advertising and stressed subjective and conjectural views. See Separate Statement of National Telecommunications and Information Administration at 1-3. However, Plaintiff ignores the fact that TCAF  was not operating in a vacuum.  It was charged with exploring financing options that would help public radio and television maintain and enhance their services to the American people. Id. at 1.  Congress directed TCAF to "ensure that no proposed new funding device would present an unacceptable risk of compromising the quality or content of public

1    broadcast programming."  In other words, the existing quality of public broadcasting under the

2    current diverse public broadcasting funding scheme depicted in the report is the factual background

3    underlying the report.

4         In addition, TCAF identified numerous problems that could result from permitting non-

5    commercial educational stations to broadcast advertisements, including prohibitively higher labor

6    and union costs,  id. at 27-30, increased payments to copyright owners, id. at 30-31, and reduced

7    funding from government, which then provided 36% of total public television income.  Id. at 35.

8    Increased union and copyright fees themselves could lead to a "shift in the mix of programming

9    available to the public on public broadcasting."  Id. at 37.  Accordingly, TCAF urged Congress to

10   continue the advertising ban.

11        Furthermore, the government submitted evidence in the form of the Noll Report and Ozier

12   declarations that the commercial-free nature of public broadcasting furthers the government's

13   interest because it "substantially increases the amount of certain kinds of programming that are

14   rarely provided by commercial broadcasters."  Noll Report at 5-6 (noting that "a great deal of

15   research" shows that an "advertiser-supported television system leads to an emphasis on mass

16   entertainment programming with insufficient attention to programs that serve a small audience,"

17   including educational programming; further noting prevalence of advertising of nutritionally

18   undesirable food and inclusion of violent content on commercial television); see also Ozier Decl.

19   ¶¶12-13; Yoo, Christopher S., Architectural Censorship and the FCC, Regulation, vol. 28, issue 1

20   (2005), at 24 (describing threat of consumer boycott of products advertised during a mini-series on

21   the Reagans aired on commercial television because of dissatisfaction with portrayal of former

22   president, as well as advertiser backlash resulting from NBC's attempt to air a movie about Roe v.

23   Wade, 410 U.S. 113 (1973)).  Furthermore, "[i]f non-commercial educational stations were

24   permitted to air paid advertisements from for-profit entities," their other sources of funding would be

25   "jeopardized," because viewers would be less inclined to support the activities of a station that they

26   do not perceive to be distinct from a commercial station, Ozier Decl. ¶¶ 7-9, constituencies would be

27   less likely to advocate for public funding, and underwriters would be less willing to pay for credits

28   to air alongside normal commercial advertisements.  Id.; see also Noll Report at 7, 19 (noting that

1   the system of government subsidies is tied to the ability of stations to attract donations, and that

2   allowing advertising would "call into question the legitimacy of subsidies").   Moreover, if "non-

3   commercial broadcasters were permitted to transform corporate underwriting to commercial

4   advertising," "non-commercial educational stations would become direct competitors of for-profit

5   stations," which would end the distinction between commercial and public broadcasting.  Noll

6   Report at 20; see also Ozier Decl. ¶ 10.

7         Finally, the government's interest would not be met by allowing paid advertising from

8   political candidates and advocacy organizations.  As noted above, Congress's goal was to insulate

9   public broadcasting from special interest influences, be they political, commercial, religious, or

10  otherwise.  127 Cong. Rec. 13145 (June 22, 1981) (remarks of Rep. Gonzalez).  If non-commercial

11  educational stations were permitted to solicit underwriting from certain advertisers such as political

12  candidates, they would have a financial incentive to create non-controversial programs with mass

13  appeal, endangering the independence "that makes American public broadcasting the artistic and

14  journalistic prize that it is."  Id. at 13146.

15        As to whether or not Section 399b is narrowly tailored to further the government's

16  substantial interest in preserving non-commercial broadcasting, the government notes that restricting

17  paid advertisements is the only way to ensure broadcast television programming free from undue

18  influence by paying advertisers on programming content.  Thus, there is a reasonable fit between the

19  government's goal and the restriction imposed.  It is difficult to imagine another effective way the

20  government could carry out its goal of insulating public broadcasters from the pressures of

21  advertisers other than by restricting advertising.

22        Further, Section 399b restricts only *paid* speech that promotes a product or service offered by

23  a profit-seeking advertiser, expresses views with respect to a matter of public importance or interest,

24  or supports or opposes a political candidate.  Stations may still carry programming that addresses

25  public issues and political candidates so long as they receive no remuneration for such

26  programming.  47 U.S.C. § 399b(a).  They may also air advertisements from non-profit entities.  47

27  U.S.C. § 399b(a)(1).  Meanwhile, the public maintains its unfettered access to paid advertisements

28  on the hundreds of other commercial broadcast stations.  In addition, the number of commercial

cable stations without any advertising restrictions have dramatically increased in recent years due to the growth of cable networks.

As this Court previously recognized, the alternative advanced by Plaintiff of limiting the length and frequency of political announcements or issue announcements would likely be ineffective, because it would not protect broadcasters from the programming pressures resulting from monetary incentives to accept paid advertising.  See Dec. 21 Order at 13 n.3; Pl. Mot. at 16. As WGBH Vice-President Ozier states in his declaration, "a noncommercial educational station would be forced to change its programming if it were forced to rely on advertising from for-profit sources . . . even if advertisements did not interrupt programming or if they were limited in length." Ozier Decl. ¶ 13; see also id. ¶ 16 (noting that even if a handful of noncommercial stations were to air for-profit advertising, all public stations would face "consequences of a perceived deviation from the public education mission" and hence "loss of funds from viewers, government, foundations, and other sources," as well as "favorable treatment for labor contracts, agreements with individual talent, broadcast rights, and copyright privileges").  Such a restriction might partially mitigate, but would not eliminate the same pressure.  Significantly, the government's choice need not be the least restrictive means of achieving its goals.  Turner I, 512 U.S. at 662.  The government has demonstrated that the statute is narrowly tailored to further a substantial government interest.  See League of Women Voters, 468 U.S. at 380.

### 3. Whether Section 399b Impermissibly Discriminates Between Types of Speech

Plaintiff's first and third causes of action challenge the constitutionality of subsections (2) and (3) of Section 399b(a), which prohibit broadcasters from broadcasting in exchange for remuneration any program material intended to support or oppose any candidate for political office or to express the views of any person on a matter of public importance.  The challenged statutes, while viewpoint neutral, are not content neutral.  The statute does, however, allow unpaid speech relating to political campaigns and issues of public importance.  The statute also prohibits promotion of "any service, facility, or product offered by any person who is engaged in such offering for profit."  47 U.S.C. § 399b(a)(1).  But it allows identifications of donors and their services, including "any aural or visual letters or words, or any symbol or sign, which is used for the exclusive purpose

1   of identifying any corporation, company, or other organization, and which is not used for the

2   purpose of promoting the products, services, or facilities of such corporation, company, or other

3   organization."  Id. § 399a.  Plaintiff therefore maintains that the statute imposes greater restrictions

4   on certain non-commercial speech than on other types of commercial speech and non-commercial

5   speech.  FAC ¶¶ 28-29, 34-35.

6          Whether or not the statute impermissibly discriminates against non-commercial speech

7   presents a more difficult issue.  Section 399b allows limited commercial speech, and in doing so

8   requires a content-based evaluation of advertisements.  Specifically, the statute allows commercial

9   advertising in the form of logograms and identification of services, while prohibiting paid

10  advertising about views on matters of public importance and political candidates that lie at the core

11  of the First Amendment.  Again, the statute allows unpaid core political speech, such as station

12  editorials.

13         As an initial matter, there is no evidence before the Court demonstrating that the statute

14  actually "imposes greater restrictions on noncommercial than on commercial" advertising.  Cf.

15  Desert Outdoor Advertising v. City of Moreno Valley, 103 F.3d 814, 819 (9th Cir. 1996) (citing

16  National Advertising Co. v. City of Orange, 861 F.2d 246, 248 (9th Cir. 1988) (citing Metromedia,

17  453 U.S. at 513, 516)) (noting that ordinance is invalid if it imposes greater restriction on

18  noncommercial billboards or regulates those billboards based on their content).  At the hearing, the

19  FCC pointed out that it has not yet addressed whether or not logograms may be used to identify

20  political donors.  Consequently, it is not clear whether political candidates would be prevented from

21  running non-advocacy logograms on public television or radio.  The Court cannot theorize about the

22  potential application of the statute to resolve Plaintiff's facial challenge.

23         Assuming that the statute permits limited non-promotional paid commercial speech via

24  underwriting announcements but does not allow such paid announcements for political candidates,

25  the government argues that the latter announcements would be inherently promotional.  The Court

26  agrees that political candidate announcements have an inherently promotional quality.  "For

27  example, while an announcement identifying Exxon Corporation, producer of petroleum products

28  would be permissible, announcements identifying Exxon as the producer of 'fine' or the 'best'

**United States District Court**
For the Northern District of California

1   petroleum products would be prohibited." Pub. Broad Serv., 86 F.C.C. 2d at 155.  But an

2   announcement identifying a particular politician's campaign, for example, is of an inherently more

3   promotional nature.  It would be difficult to distinguish identifying a candidate from promoting that

4   candidate.  The candidate is what is being promoted, as opposed to a particular product or service

5   sold by a corporate sponsor.[7]

6          Congress reasonably determined that certain types of paid programming will undermine the

7   purposes of noncommercial programming, but that other types of paid programming will not.  Paid-

8   for political, issue, and commercial advertisements were determined by the government to impact

9   programming decisions of noncommercial stations.  By contrast, Congress determined that limited

10  underwriting announcements, which have now been used for nearly thirty years, would not threaten

11  programming.  Similarly, Congress did not find that promotional materials sponsored by non-profit

12  organizations threatened the programming content of public stations.

13         Plaintiff relies heavily on the case Ballen v. City of Redmond, 466 F.3d 736 (9th Cir. 2006)

14  in support of its argument that Section 399b's different treatment of types of speech

15  unconstitutional.  Ballen was a First Amendment commercial speech case arising from a conflict

16  between a business's use of outdoor advertising and a municipality's signage ordinance.  Id. at 740.

17  The city's ordinance prohibited portable signs, such as sandwich boards, but carved out ten

18  exceptions, including allowing portable real estate and political signs.  Id.  The stated purpose of the

19  ban was to promote traffic safety and community aesthetics.  Id.  The Court struck down the

20  restriction because the exceptions to the ban, which discriminated between types of speech,

21  demonstrated that the ban was not reasonably tailored to fit the purposes it purportedly served.  The

22

23         [7]  The government also relies on United States v. Edge Broadcasting Co., 509 U.S. 418, 434
    (1993), noting that Congress may advance its interest in preserving the unique character of non-
24  commercial broadcasting by limiting the types of messages for which non-commercial educational
    stations can receive remuneration, even if advertising is not completely eradicated.  While this case only
25  involved commercial speech, it supports the general proposition that Congress may validly limit the
    content of advertising on public broadcasting stations.  In Edge, a broadcaster licensed in a state that
26  prohibited lotteries brought an action against petitioners seeking a declaration that the Charity Games
    Advertising Clarification Act of 1988, 18 U.S.C. §§ 1304, 1307, violated its rights under the First
27  Amendment.  The broadcaster wished to broadcast lottery advertisements to its viewers in a state which
    sponsored a lottery, but such advertising was prohibited under the Act.  Applying the four-factor test
28  for commercial speech, the Court found that the statute directly advanced the governmental interest of
    supporting the anti-gambling law of one state, while not unduly interfering with the pro-gambling law
    of another, and that it was narrowly tailored.  Id.

                                                25

advertising sign appellant wanted to display contained purely commercial speech.

The Court applied the four-part test of Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 561-62 (1980), under which the validity of the restriction depends on: (1) whether the expression is protected by the First Amendment, which requires the speech to concern lawful activity and not be misleading; (2) whether the asserted governmental interest is substantial; (3) whether the regulation directly advances the governmental interest asserted; and (4) whether the regulation is not more extensive than necessary to serve that interest. Ballen, 466 F.3d at 742 (citing Central Hudson, 447 U.S. at 566). The Court held that the regulation did not satisfy Central Hudson's fourth prong, which requires "that there be a reasonable fit between the restriction and the goal" and that the regulation be narrowly tailored to achieve that goal, because the exceptions to the sign ordinance were all content-based, and the city failed to show how the exempted signs reduced "vehicular and pedestrian safety or besmirch[ed] community aesthetics any less than the prohibited signs." Id. at 743. In addition, the Court noted that, while the City chose to protect "ubiquitous real estate signs," which could "turn an inviting sidewalk into an obstacle course challenging even the most dextrous hurdler," its ordinance "unfairly restrict[ed] the First Amendment rights of, among others, a lone bagel shop owner." Id.

As the government notes, the situation here is very different from that in Ballen. The limited broadcasting spectrum presents a significantly different context than do billboards. In Ballen, the Ninth Circuit emphasized that the Supreme Court, in Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501 (1981), "cautioned that '[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method.'" Ballen, 466 F.3d at 744. In Metromedia, the Court noted that the "law of billboards" was distinguishable from the law of portable sandwich boards, since "billboards are fixed, permanent structures that are more intrusive to community aesthetics." Metromedia, 453 U.S. at 501.

Outdoor signage restrictions differ even more starkly from the public broadcasting restrictions at issue here, which are intended to protect the quality, character, and benefits of public broadcasting from the influence of market forces, in order to prevent it from becoming similar to commercial television. If precedent regarding billboards is inapplicable to sandwich boards even

United States District Court
For the Northern District of California

1    though both employ outdoor print media, then precedent regarding outdoor signs is even less

2    applicable to public broadcasting – a completely different method of communicating ideas.

3        Moreover, in Ballen, the Court found that the city failed to show how the exempted signs

4    reduced "vehicular and pedestrian safety or besmirch[ed] community aesthetics any less than the

5    prohibited signs." 466 F.3d at 743. Similarly, in Metromedia, the Supreme Court noted that the city

6    did "not explain how or why noncommercial billboards located in places where commercial

7    billboards are permitted would be more threatening to safe driving or would detract more from the

8    beauty of the city." 453 U.S. at 513. See also Berger v. City of Seattle, 569 F.3d 1029 (9th Cir.

9    2009) (where the City of Seattle's rules required, in part, that street performers obtain permits for

10   performance at an entertainment center, the Court struck down the regulation, noting that the city's

11   asserted interests in reducing disputes involving street performers and coordinating uses at a public

12   park were not promoted by the permitting requirements, because the permits were freely issued, did

13   not screen out hostile performers, and did not aid in coordinating multiple uses of the center's

14   grounds); City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 425-26 (1993) (striking

15   down a content based regulation that favored non-commercial speech over commercial speech,

16   where the city did not establish a reasonable fit between its legitimate interests in safety and

17   aesthetics and its selective ban of commercial handbills, but not newspapers).[8] By contrast, here,

18   there is a reasonable fit between the government's purpose and the restriction imposed, since

19   commercial and political advertisements all yield similar commercial pressures on public stations, as

20   discussed below.

21       Plaintiff also argues that Ballen's holding that "the City's use of a content-based ban rather

22

23       [8]    In addition, this case is distinguishable from Desert Outdoor Advertising v. City of Moreno
24   Valley, 103 F.3d 814, 820 (9th Cir. 1996), in which the court applied strict scrutiny. There, the
     applicable "exemptions require[d] City officials to examine the content of noncommercial off-site
25   structures and signs to determine whether the exemption applies, [so] the City's regulation of
     noncommercial speech [wa]s content-based." Here, in contrast, intermediate scrutiny applies. In
     addition, the Court held that "Moreno Valley Ordinance No. 133 [under which on-site structures and
26   signs were limited to commercial structures and signs] unconstitutionally imposes greater restrictions
     upon noncommercial structures and signs than it does upon commercial structures and signs." Id. As
27   the government notes, the First Amendment permits more intrusive regulation of broadcast speakers
     than of speakers in other media. Turner I, 512 U.S. at 637. Furthermore, similar to the above cases, the
28   Court in Desert Outdoor found that the City failed to show that it enacted its ordinance to further its
     articulated interests in aesthetics and safety. See 103 F.3d at 819.

1    than a valid time, place, or manner restriction indicates that the City has not carefully calculated the

2    costs and benefits associated with the burden on speech imposed by its discriminatory, content-

3    based prohibition" indicates that Section 399b is unconstitutional.  466 F.3d. at 743.  The Ballen

4    Court noted that the city "could impose time, place, and manner restrictions on all commercial

5    signs."  Id. at 744.  Here, however, it is not clear that limiting the number or length of

6    announcements, as Plaintiff suggests (Pl. Reply at 6), would further the governmental interest, as

7    noted above.  Even allowing limited advertising would force public stations to divert a great deal of

8    resources into the market analysis that must accompany reliance on advertising income.  Nor would

9    allowing paid political and issue advertisements serve the government's purpose, as political and

10   issue advertisers, like commercial advertisers, generally want to reach as large an audience as

11   possible.  While Congress did not undertake specific factual analysis to determine whether or not

12   issue and political advertisements specifically created commercial pressure on stations, Congress's

13   determination that allowing such advertisements would create commercial pressures was a

14   reasonable, predictive legislative judgment that political advertisers would generally seek large

15   audiences.

16          Furthermore, broadcasters accepting money for paid political advertisements would also be

17   subject to pressure to tailor programming, since a great deal of money is spent on such advertising.

18   See Fed. Mot. at 15 (citing Appendix of Authorities, Tab 2 (AdWeek, Dec. 15, 2008 at 3) (noting

19   $2.2 billion spent on political advertisements in 2008).  In addition, the government's regulations

20   only apply to a small number of channels on television and radio.  The public has access to paid

21   advertisements on the far more numerous commercial channels.  In other words, the restriction itself,

22   by being limited to certain public stations, is somewhat analogous to a time, place, manner

23   restriction, if the Court were to apply the billboard and signage line of cases here.

24          Plaintiff also argues that the FCC's allowance of promotional advertisements by non-profits

25   undercuts the government's arguments that promotional issue and political advertisements "are . . .

26   dangerous to . . . non-commercial broadcasters."  Pl. Reply at 6.  Specifically, Plaintiff points out

27   that Planned Parenthood was allowed to run a promotional advertisement, which Plaintiff seems to

28   equate with promoting abortions, a controversial topic.  The underwriting announcement in question,

**United States District Court**
For the Northern District of California

however, merely identified the organization Planned Parenthood, noting that it offers reproductive

health care services, including pregnancy testing and annual exams, among other things.  The

announcement did not list abortion among those services.  See Diercks Affidavit, Ex. A.  The FCC's

advisory opinion stated that the announcement was not an advertisement, because Planned

Parenthood was not a for-profit; did not violate Section 399b(1); and did not express views on

matters of public importance or interest in violation of Section 399b(2).  In sum, the announcement

was neither specifically promotional nor expressive of a view on a matter of public importance.

This particular advisory opinion, therefore, does not support Plaintiff's case.

Finally, to the extent that Plaintiff claims that the statute impermissibly discriminates

between different types of paid commercial speech, that claim fails.  Section 399b allows paid

messages promoting products and services on behalf of non-profits, but does not allow other types of

paid advertising.  Commercial speech may be content regulated.  Cent. Hudson Gas & Elec. Corp. v.

Public Serv. Comm'n, 447 U.S. 557, 564 n.6 (1980) ("Two features of commercial speech permit

regulation of its content.  First, commercial speakers have extensive knowledge of both the market

and their products.  Thus, they are well situated to evaluate the accuracy of their messages and the

lawfulness of the underlying activity.  In addition, commercial speech, the offspring of economic

self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by

overbroad regulation.") (internal citations and quotations omitted).  In addition, Congress reasonably

concluded that the broadcast of paid, promotional material for non-profit organizations did not

threaten the character and programming of public broadcasting, as viewers have not seen messages

from such entities as being inconsistent with the public education mission of public television, and

the small market for non-profit advertising is less likely to generate conflicts with a public

broadcaster's educational mission and does not threaten traditional funding sources.  See Ozier Dec.

¶ 15.

### C.     Whether § 399b is Unconstitutionally Vague

"To pass constitutional muster against a vagueness attack, a statute must give a person of

ordinary intelligence adequate notice of the conduct it proscribes."  Dec. 21 Order at 15-16 (citing

U.S. v. 594,464 Pounds of Salmon, 871 F.2d 824, 829 (9th Cir. 1989)).  Plaintiff claims that Section

United States District Court
For the Northern District of California

399b(a)(1), which prohibits any paid message intended to promote any service, facility, or product offered by any person who is engaged in such offering for profit, is vague because of the term "promote." Yet, as this Court previously noted, the general concept of promoting a product or service is one that is easily grasped by a person of ordinary intelligence in this modern age of commercial marketing and would appear to be a term of "common understanding." Dec. 21 Order at 17 (citing Cal. Teachers Ass'n v. Board of Educ., 271 F.3d 1141, 1152 (9th Cir. 2001)). This Court further stated:

> The term is no less precise than the terms cited in California Teachers that survived facial vagueness challenges. In addition, it is not likely that any ambiguity in the terms of § 399b(a)(1) will chill any more than a negligible amount of commercial speech. See id. at 1151 (citing Bates v. State Bar of Arizona, 433 U.S. 350, 380-81 (1977) (commercial speech unlikely to be chilled because commercial entities have strong economic interest in engaging in such speech).

Dec. 21 Order at 17.

Assuming that the Court may "perhaps to some degree" consider the FCC's interpretation of the statute in evaluating whether the statute is vague, see Grayned v. City of Rockford 408 U.S. 104, 110 (1972), as Plaintiff urges the Court to do, arguable inconsistencies in a statute's application in a handful of cases do not condemn a statute. If such limited inconsistencies rendered statutes unconstitutionally vague, the majority of statutes would probably not survive a vagueness challenge. Rather, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" California Teachers Ass'n, 271 F.3d at 1151 (quoting Hill v. Colorado, 530 U.S. 703, 733 (2000) (rejecting vagueness challenge) (quotation marks omitted)). As in Grayned, the words of the statute here are marked by "flexibility and reasonable breadth, rather than meticulous specificity," and "it is clear what the ordinance as a whole prohibits." 408 U.S. at 110 (quoting Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8th Cir. 1969)).

Plaintiff argues that the FCC has made numerous "admissions" by acknowledging that it is difficult at times to distinguish between which announcements promote and which merely identify, and that it only expects "public broadcast licensees to exercise reasonable, good faith judgments in

United States District Court
For the Northern District of California

1  this regard."  See FAC ¶ 14 (quoting Memorandum Opinion and Order in Docket No. 21134, 90

2  F.C.C.2d 895, 911 (1982)).  As the government points out, however, the fact that it may at times be

3  difficult to distinguish promotional announcements from identifying announcements simply

4  illustrates the utility of the Commission's periodic guidance on its underwriting standards, and does

5  not mean that the statute is unconstitutionally vague.[9]  In fact, under the FCC's rules, a station that is

6  unsure of whether a particular underwriting announcement would run afoul of the statute may seek

7  informal guidance or formal clarification from the agency.  47 C.F.R. § 1.2.  Plaintiff also maintains

8  that the FCC's statements show that the prohibitions are not set out "precisely," but precision is not

9  constitutionally required.  Finally, Plaintiff argues that the FCC's amorphous and subjective

10  enforcement standards lead to arbitrary and discriminatory enforcement by the FCC.  Plaintiff's

11  examples, however, do not show that the FCC's enforcement is arbitrary or discriminatory.

12       Plaintiff cites a handful of examples of FCC interpretations permitting broadcasters to run

13  underwriting announcements that Plaintiff contend are clearly promotional.  See, e.g., Diercks

14  Affidavit, Ex. D & Brown Decl. ¶ 2, Ex. A (announcement run by Lakeshore Communications

15  stating "I wish there was a place to buy all the Christian music I hear on Q90. . ."); Ex. E

16  (announcement run by WESM-FM Radio reading "This hour of Rhythm and Romance is made

17  possible by a grant from Arista Records . . . . New this month from Arista, Lisa Stanfield's All

18  Around the World . . .").  As the government notes, however, the FCC sent Lakeshore

19  Communications a warning letter about the Christian music announcements, stating that although

20  the announcements were not as egregious as some others, the FCC expected the station to better

21  conform its underwriting announcements to FCC guidelines in the future.  Diercks Affidavit, Ex. D;

22  Brown Reply Decl., Ex. A.  While Plaintiff disputes that this letter constituted a warning, it clearly

23  put Lakeshore on notice.  The Commission issues warning letters in lieu of formal enforcement if it

24  appears that the violation complained of was minor or the licensee has an otherwise unblemished

25

26       [9]    The government also notes that the agency's administrative guidance serves to further

27  "narrow potentially vague or arbitrary interpretations" of the statute.  Village of Hoffman Estates v.
   Flipside, Hoffman Estates, 455 U.S. 489, 504 (1982) ("In economic regulation especially, such
   administrative regulation will often suffice to clarify a standard with an otherwise uncertain scope.").

28  However, the ordinance in Hoffman did not embrace non-commercial speech and only had an attenuated
   relationship to commercial speech, so it is not clear that this principal applies here.

**United States District Court**
For the Northern District of California

record.  <u>See In re Commission's Forfeiture Policy Statement & Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines</u>, 12 FCC Rcd 17087, 17102 (1997) ("We agree that warnings can be an effective compliance tool in some cases involving minor or first time violations.").  As the government notes, the second announcement by WESM-FM identifying Arista Records is more in the nature of an identification than overt marketing.  Diercks Affidavit, Ex. E.

Plaintiff also cited two underwriting announcements from WETA FM, which apparently violated the FCC Rules.  <u>See</u> Pl. Mot. at 24-25; Diercks Affidavit, Ex. F at 84-85.  But the agency never received a complaint about the first announcement to which Plaintiff refers, and with respect to the second underwriting announcement, the FCC dismissed the complaint on procedural grounds without deciding whether or not the language contained a substantive violation.  <u>See</u> Brown Reply Decl. ¶ 3, Ex. B.

In any event, a handful of examples of FCC rulings and guidance that arguably tolerate some promotional announcements does not suffice to show that the statute is unconstitutionally vague. Plaintiff has failed to introduce evidence of FCC enforcement decisions sufficiently inconsistent as to show that the statute is unconstitutionally vague on its face and not capable of giving notice of the proscribed conduct.  In sum, Plaintiff does not identify anything in Section 399b(a)(1) itself that is unconstitutionally vague.

**IV.    CONCLUSION**

For the foregoing reasons, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: August 19, 2009

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge